Ernest CHAMBERS, Plaintiff,

v.

Frank MARSH, State Treasurer; Robert E. Palmer, Chaplain and Officer of the Nebraska Unicameral; Frank Lewis, John DeCamp, Robert L. Clark, Tom Fitzgerald, Steve Fowler, Howard A. Lamb, Richard D. Marvel, Loran Schmit, and Jerome Warner, in their official capacity as members of the Executive Board of the Legislative Council of the Nebraska Unicameral, Defendants.

No. CV79-L-294.

United States District Court,
D. Nebraska.

Dec. 24, 1980.

Herbert J. Friedman, Lincoln, Neb., Stephen L. Pevar, ACLU, Denver, Colo., for plaintiff.

Shaner L. Cronk, Asst. Atty. Gen., Lincoln, Neb., for defendants.

URBOM, Chief Judge.

At stake is the practice of having each day's proceedings of the Nebraska Unicameral Legislature open with a prayer by a chaplain who is paid with public funds and of having those prayers published at state expense and distributed to members and nonmembers. I conclude that the Establishment Clause of the First Amendment to the Constitution of the United States is not breached by having the prayers, but is breached by paying the chaplain to say them and by publishing and distributing them.

## THE FACTS OF THE CASE

Ernest Chambers is a duly elected state senator of the Nebraska Unicameral Legislature, District 11, a citizen and taxpayer of the State of Nebraska, and is not a Christian.

At the beginning of each session of the Nebraska Unicameral Legislature the Executive Board of the Legislative Council of the Legislature recommends the selection of court officers, one of them being called "chaplain." The selection of the chaplain is provided for by Rule 1, section 2, of the Rules of the Nebraska Unicameral, Officers and Employees, which says:

"In addition, the Legislature shall advise and consent to the recommendations of the Executive Board of the Legislative Council for the following officers: ... Chaplain."

Rule 1, section 21, of the Rules states: "The Chaplain shall attend and shall open with prayer each day's sitting of the Legislature."

Robert E. Palmer, one of the defendants, has been the duly selected chaplain of the Nebraska Legislature since 1965. His salary is $319.75 per month for each month the legislature is in session. The salary is paid from the general funds of the State of Nebraska and is disbursed by the State Treasurer, the defendant Frank Marsh. The prayers at each day's opening are recorded each day in the Legislative Journal. In the years 1975, 1978 and 1979 prayer books containing selected offerings given during the legislative sessions of those years were prepared pursuant to motions made and approved on the floor of the legislature. Copies of the book were distributed to the legislative membership and to other individuals upon request. Two hundred copies of the 1975 book were printed at state expense totaling $70.01; 200 copies of the 1978 book were printed at state expense totaling $260.40; and 100 copies of the 1979 book cost the state $128.15. Robert E. Palmer is and for a number of years prior to the filing of this action has been an ordained clergyman in the State of Nebraska of the Christian faith, is head of staff of Westminster Presbyterian Church in Lincoln, Nebraska, and has been since 1963.

The defendant Frank Marsh is the duly elected State Treasurer, charged with the payment of public funds as salaries to members of the legislature and particularly to the defendant Robert E. Palmer. The other defendants are members of the Executive Board of the Legislative Council of the Nebraska Unicameral Legislature and are duly elected state legislators.

Other findings of fact, developed as a result of a trial in this court, will be noted as they become appropriate to the discussion throughout this memorandum.

## DISCUSSION

### I.

The turmoil over the proper interplay between government and religion in America antedates the Constitution and has been continual throughout the Republic's history. The struggle has been to find that decent accommodation which allows full virility of government within its distinct sphere and full virility of religion within its distinct sphere. When the spheres have overlapped, sparks have often flown.

The Constitutional Congress in 1774 opened its session with prayer over the objections of John Jay and John Rutledge based upon the diversity of religious preferences in that body.[1] A decade later the Constitutional Convention in Philadelphia failed to adopt Benjamin Franklin's motion for an opening prayer, but the Congress which emerged from the Convention took on the custom of the Continental Congress of having its sessions opened with prayer and has continued with that custom to this day. It is probably true that the legislatures of each of the fifty states begin each session with an opening prayer, and it has been said that eighteen states, as well as the United States Congress, employ a chaplain or chaplains to give the prayers.[2] The constitutionality of employment of legislative chaplains by the United States Congress was challenged in *Elliott v. White*, 57 App.D.C. 389, 23 F.2d 997 (1928), but the case was dismissed on the ground that the plaintiff, as a taxpayer, had no standing to bring the complaint under the rule of *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).[3]

From the beginning of our country's life, friction has come between those who favor and those who disfavor having prayers in legislative chambers by paid or unpaid members of the clergy. New York, for example, had some stormy times. When the state's first constitution was adopted, it stated that all members of the clergy were ineligible for any "civil ... office or place within this state." For about fifty years thereafter no prayer opened the legislative sessions and no chaplains for the legislature were allowed. By statute in 1829, however, payment with civil funds of chaplains for the legislature began by both houses. So many petitions against the practice— whether against the appointments or the paying is not known—were received that a select committee was commissioned to study the matter and report. It did so, urging abolition of any statute authorizing chaplaincies, as being unconstitutional. The legislature repealed the statute authorizing payment of the chaplains, but did not directly resolve the principle of legislative chaplaincies, as such, in the state.[4]

Nebraska's use of a chaplain for opening of its daily legislative sessions began as early as 1855, twelve years before statehood.[5] The laws of 1867 provided that the chaplain would be a salaried officer or employee of the House of Representatives with the duty of opening the session of each house of the legislature with prayer.[6] The statutes continuously made provision for a chaplain with that duty until 1973, when the present statute was enacted, declaring that the Executive Board of the Legislative Council was to make recommendations for "such other officers as may be deemed nec-

1. Stokes & Pfeffer, *Church and State in the United States* (1st ed. 1964), pp. 83, 478–482.

2. *Colo v. Treasurer and Receiver General*, Mass., 392 N.E.2d 1195 (1979).

3. Here, the plaintiff is a member of the legislature and no question has been raised of his standing to bring this action, except as discussed in footnote 14, infra.

4. Blau, *Cornerstones of Religious Freedom in America* (1949), pp. 136–156.

5. Nebraska House Journal, Council and House, First and Second Sessions 1855, shows that on Monday, January 22, "on motion of Mr. Richardson, RESOLVED that the President be authorized to invite Rev. W. Hamilton or some other clergyman, to officiate as chaplain to this body at the opening of its daily sessions."

6. Laws, 1867, Sections 2, 3 and 4.

essary."[7] The rules of the Nebraska Unicameral since then have required the Executive Board's recommending a chaplain with the duty of attending and opening each day's sitting with prayer.

## II.

■ The Establishment Clause of the First Amendment to the Constitution of the United States is:

"Congress shall make no law respecting an establishment of religion ..."

That clause is made applicable to each state by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). For a state, then, the clause could be said to read, "A legislature shall make no law respecting the establishment of religion." Although a broad statement misses the nooks and crannies, it may be helpful conceptually to say that the clause forbids a legislature from making any law that tends to firm up or support religion or to prefer one branch of religion or one religious belief over another. From that can begin an analysis of the specific features of the practice being challenged here.

In distinction from cases decided by the Supreme Court of the United States under the Establishment Clause, this case springs from a prayer practice that is, for the most part, an internal act—that is, one directed at the governmental unit itself or its own members. The legislature's causing invocational prayers and the prayers themselves are for the legislators' own benefit. Any hearing of the prayers by anyone other than the legislators is quite coincidental. The legislators, during the saying of the prayers, are not in their law-making stance vis-a-vis the public. Such an internal or in-house practice is not well suited to analysis by standards developed for judging practices mandated by governmental bodies upon nonmembers of the bodies, such as prayers and bible reading by or for public school children, as in *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), and *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), or posting of the Ten Commandments on the wall of a public classroom, as in *Stone v. Graham*, —— U.S. ——, 101 S.Ct. 193, 66 L.Ed.2d 199 (1980), or the use of funds collected from taxpayers to provide financial aid to nonpublic schools, as in *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

■ The First Amendment, through the Fourteenth, declares that state legislatures shall "make no law respecting the establishment of religion." It occurs to me that not everything that a legislature does is "making" a "law." It makes a law when it decrees that *someone else* must do something. I doubt that allowing prayer for or by its own members is "making a law" in any sense. Neither what legislators do for and by themselves nor what a legislature does for and by itself with no significant impact on anyone else is the making of laws. A legislator walks to church for worship; he or she is not thereby making a law. Each of the legislators walks to church for worship—even to the same church; they are not thereby making a law. A legislator, or some legislators, or all the legislators hear a prayer in their chamber or offices; they are not thereby making a law. The legislature by majority vote invites a clergyman to give a prayer; neither the voting nor the inviting nor the giving nor the hearing of the prayer is making a law.

On this basis alone, it seems to me, I must hold that the saying of prayers, per se, in the legislative halls at the opening of each session is not prohibited by the First and Fourteenth Amendments.

■ *Bogen v. Doty*, 598 F.2d 1110 (C.A. 8th Cir. 1979), reaches the same conclusion through the test promulgated in *Nyquist*, supra—the purpose-effect-entanglement test.[8] If the same test is put to the Nebras-

---

7. Section 50–111, R.R.S.Neb. (1943, as amended).

8. "... [T]o pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose,

ka legislative practice, aside from payment of the chaplain and the printing at public expense and distributing of the prayers, the result is the same as in the *Bogen* case. There is reflected by the practice a clearly secular purpose: bringing the legislators to order by means of a brief, solemn and thoughtful act in a traditional manner. To say that the prayers have no religious purpose would reach incredibility; they do indeed have a religious purpose for the chaplain and those who choose to listen for spiritual reasons. The prayers also have a secular purpose, and it is genuine enough and strong enough to meet the constitutional measurement.

As to the effect of the practice of an invocation, it is in fact primarily secular. Irrespective of what some persons might hope for or wish to be true, the actual effect of these prayers on religion, I am persuaded by the record made in this case, is virtually nonexistent. The problem is not new. James Madison observed with respect to prayers in Congress in his day that "the daily devotions conducted by these legal Ecclesiastics [were] already degenerating into a scanty attendance and a tiresome formality."[9] The constitutional test is not, as the plaintiff asserts, whether the prayers have *any* effect or *could have* some effect. The test, rather, is whether the primary effect is to advance or inhibit religion. *Nyguist*, supra, 413 U.S. at 773, 93 S.Ct. at 2965, and *Abington*, supra, 374 U.S. at 222. The primary effect of the prayers, I find as a matter of fact, is neither to advance nor to inhibit religion. Other expressions have been used to state the "primary effect" idea. It must not have the "direct and immediate effect of advancing religion," as opposed to "a remote and incidental effect." *Nyquist*, supra, at 784, n. 39, 93 S.Ct. at 297.

That revision of wording, carrying perhaps a stricter test, does not change my findings here. The having of prayers in the legislature of Nebraska does not have a direct and immediate effect of advancing or inhibiting religion.

For me or any other judge to say that these particular prayers have no effect upon the spiritual life of individual senators would be presumptuous, and I do not say it. Whether a prayer is vibrant or flat or irritating or irrelevant in a privately spiritual sense is too personal for a judge to decide, except as to himself. It is at this point that I find the effect test, which was developed in other settings by the Supreme Court, awkward to apply to cases, such as this one, in which the religious act is done by and for the legislators themselves, rather than by and for someone else at the legislators' direction. The test can be adjusted to this case by saying that my assignment is to decide whether the practice of saying prayers in the legislature is advancing or inhibiting religion in religion's institutional or generic sense. As to that, I find that it is not. There is neither hurting nor helping of institutional or generic religion or any subpart of it. The same result obtains whether I rely, on the one hand, upon the opinions of the witnesses in this case as to the actual effect, or, on the other hand, upon evidence of the nature of the practice and my view of the probable consequences rationally to flow from that nature.

It is true, as the plaintiff's counsel point out, that the Supreme Court of Nebraska has said: "Prayer is always worship."[10] It is also true that the Supreme Court of the United States has said:

"The nature of such a prayer [a solemn avowal of divine faith and supplication

... second, must have a primary effect that neither advances nor inhibits religion, ... and, third, must avoid excessive governmental entanglement with religion ..." 413 U.S. at 773, 93 S.Ct. at 2965.

9. Pfeffer, *Church State and Freedom* (1967), p. 248, citing Fleet, "Madison's Detached Memorandum," William & Mary Quarterly, October, 1946, p. 559.

10. *Ancient & Accepted Scottish Rite of Freemasonry v. Board of County Commissioners,*

for the blessings of the Almighty] has always been religious ..." [11]

Nonetheless, neither court was declaring that prayer can have no possible effect other than one that is primarily religious or that prayer always has a direct and immediate effect of advancing religion. Praying by its nature may be *always* religious; its significant *effect* may be—and in the context of this case is—otherwise.

One worthy admonition for us in this area is to avoid being tightly clutched by the particular words used in a different setting by an opinion writer. Chief Justice Burger reminded us in *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970):

"... In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles."

The plaintiff argues that the effect test is failed if the secular effect could be achieved without using a religious means. I am not able to accept that as a flat constitutional proposition, and the plaintiff's counsel has cited no case for it, except a concurring opinion of Justice Brennan in *Abington School District v. Schempp*, supra, 374 U.S. at 281, 83 S.Ct. at 1602 and *Ring v. Grand Forks Public School District No. 1*, 483 F.Supp. 272, 274 (U.S.D.C.N.D.1980). When Justice Brennan made that statement, however, he was not speaking for the court and

was not speaking of prayers in legislative halls. Indeed, later in that same concurring opinion he did speak of prayers in legislative chambers and said they "might well represent no involvements of the kind prohibited by the Establishment Clause." 374 U.S. at 299. The *Ring* opinion merely cited the Brennan concurring opinion in *Abington* and does not have to do with legislative prayers or chaplains.

Distinguishing this case from the school-prayer and bible-reading cases is not difficult. I agree with the court in that respect in *Colo v. Treasurer and Receiver General*, Mass., 392 N.E.2d 1195, 1200 (1979):

"... The purpose of a school is to teach impressionable children, many of whom, because of their ages, cannot be expected to comprehend that school-sponsored prayers are not necessarily 'lessons' to be learned like other aspects of the school program ... By contrast, mature legislators may reasonably be assumed to have fully formed their own religious beliefs or nonbeliefs. The provision for a ceremonial moment of meditation at the opening of the ... sessions is unlikely to advance religious belief among the legislators or their constituency, even if it does give recognition to the traditional place that prayer has occupied in such a ritual for two centuries."

See, also, *State ex rel. Finger v. Weedman*, 55 S.D. 343, 226 N.W. 348 (1929).

Moreover, the voluntariness of attendance makes a difference. The children are in school mandatorily; the senators are not in the senate mandatorily, but by choice.[12] While voluntariness is properly a consideration under the Free Exercise

122 Neb. 586, 241 N.W. 93 (1932), quoting *People v. Board of Education*, 245 Ill. 334, 339.

11. *Engel v. Vitale*, supra, at 424-425, 82 S.Ct. at 1263.

12. A rule of the Nebraska Legislature requires that "every member shall be present within the Legislative Chamber during the meetings of the Legislature ..., unless excused ..." Unless the excuse for nonattendance is deemed suffi-

cient by the legislature, the "presence of any member may be compelled, if necessary, by sending the Sergeant at Arms." Rule 2, section 4, Rules of the Nebraska Unicameral January 23, 1979, plaintiff's Exhibit 4. The rule is rarely if ever used. Senator Chambers usually absents himself during the prayers and so far as the evidence shows there has been no attempt to enforce the rule. Whether he has sought to be excused is not known.

Clause of the First Amendment[13], it is also a factor in assessing the effect of a practice under the Establishment Clause. See *Abington*, supra, concurring opinion of Justice Brennan, at pp. 299–300, saying:

> "Legislators, federal and state, are mature adults who may presumably absent themselves from such public and ceremonial exercises without incurring any penalty, direct or indirect ..."

Senator Chambers, although personally offended by the practice of having the prayers and by their content, has had only minor inconvenience in absenting himself and has suffered no significant obloquy as a result of his nonattendance.

Excessive entanglement is the third part of the analysis used by the Court of Appeals in *Bogen v. Doty*, supra. As in the *Bogen* case, I think that the saying of the prayers alone entangles the state in religious affairs only nominally. The entanglement is not excessive. The court in *Bogen* cautioned the state governmental unit of the "quagmire" of excessive entanglement which may result from refusing volunteers of one religious persuasion while inviting others to give prayers. *Bogen*, 598 F.2d at 1114. The same quagmire may be near in Nebraska, but the record is so far barren of the legislature's having entered it.

### III.

▉ Paying a salary to the chaplain and paying for and causing the printing of prayer books containing selections from the chaplain's legislative offerings, all at the taxpayers' expense, are in a different posture.[14] Directing the treasurer to pay tax money either to the chaplain or to a printer for prayer books is making a law. It is done by the legislature in its governmental capacity and imposes obligations upon nonmembers. It respects religion because it has an immediate and direct effect, substantial in scope, in advancing religion.

The process of printing and distributing books of prayers suffers an additional defect: It has no secular purpose. Whereas an invocation offers the rewards of a starting of the business of the day in a thoughtful mood and the extension of a tradition, the prayer book is devoid of any such goals, and no other secular purpose has been suggested by counsel. The use of the prayer book does not fall into a category of private meditational material for the legislators, because distribution has been to nonlegislators as well as to legislators.[15]

The Supreme Court of the United States has mapped out the road regarding payment of public funds for religious activities. The federal government cannot give unrestricted construction funds or loans to sectarian colleges, because the money could be used for a religious need.[16] A state cannot loan religiously neutral equipment, such as tape recorders and laboratory supplies to nonpublic schools, because the ultimate effect of the state's activity might be a reli-

---

13. *Hamilton v. Regents of the University of California*, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934).

14. Without otherwise addressing the issues of paying the chaplain and publishing the prayer books, the defendants argue that the plaintiff has no standing to raise those issues, presumably on the theory that he is seeking to raise them only because of his status as a taxpayer and taxpayers, as such, have no standing to challenge the expenditures. But it appears to me that Senator Chambers is challenging the entire prayer practice, including its features of payment, printing and distribution, as a non-Christian member of the legislature, not merely as a taxpayer. He has standing.

15. The foreword to the published book of prayers for 1979 expresses a religious purpose only and acknowledges a goal of encouraging the use of the prayers by others who may wish to use them "as expressions of faith before God and others." It continues:

> "I have the distinct impression that a new hunger for the transcendent is abroad in our land. The vertical dimension of life is again asserting its claims. Even the more flamboyant secularism cannot fully stifle the human need to pray. We need God's power, presence and purpose in our pilgrimage, and we need the opportunity to express this need. This discovery may yet be the most significant fact as our nation begins the decade of the 1980's."

16. *Tilton v. Richardson*, 403 U.S. 672, 683, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1971).

gious one.[17] A state cannot return a portion of a private school's tuition fees to parents, because the ultimate effect might be a religious one.[18] The court in *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973), said:

> "Aid normally may be thought to have a primary effect of advancing religion . . . when it funds a specifically religious activity in an otherwise substantially secular setting."

The chaplain's salary is no small amount, but the amount is immaterial.

> "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947)

> "The imposition of taxes to pay ministers' salaries . . . aroused their indignation. It was these feelings which found expression in the First Amendment." *Id.*, at 11, 67 S.Ct. at 509

■ The direct and immediate religious effect of Nebraska's funding a chaplain's salary is in securing a firm and continuing relationship with a particular cleric of one denomination to the virtual exclusion of all others for at least the several-month session of the legislature. That does not mean that no clergypersons of other religious persuasions are afforded an opportunity to offer opening prayers. Over the years the chaplain has asked others to fill in for him when he is absent. From time to time various senators have asked whether their own clergypersons might be invited, and in those instances the chaplain has always honored the requests, including one of the Jewish

faith. Nevertheless, the chaplain for fifteen years has been of one faith, of one denomination, of one set of religious beliefs, embodied in one person. Use of public money to finance that arrangement—and to finance the printing for distribution to members and nonmembers of the resulting prayers—has resulted in the placing of "the power, prestige and financial support of government . . . behind a particular religious belief" or set of beliefs, which the Establishment Clause is designed to prevent. *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1963).

> "It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." *Id.*, 370 U.S. at 435, 82 S.Ct. at 1269

The result of this holding is that prayers may be had in the legislative hall, but not at public expense, and those prayers may be published and distributed, but not at public expense. That distinction is not new. James Madison, the author of the First Amendment's Religion Clauses,[19] participated in the selection of the first Congressional chaplain but later expressed the opinion that such a chaplaincy should be at the members' own expense. He said:

> "If Religion consist in voluntary acts of individuals, singly, or voluntarily associated, and it be proper that public functionaries, as well as their Constituents shd discharge their religious duties, let them like their Constituents, do so at their own expense. How small a contribution from each member of Congs wd

---

17. *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977).

18. *Sloan v. Lemon*, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973).

19. On September 23, 1789, Madison presented to the House of Representatives a Conference Report, recommending adoption of a stronger version of the Religion Clauses than the Senate

had previous accepted. "As Irving Brant puts it, 'Of all the versions of the religious guarantee, this most directly covered the thing he was aiming at—absolute separation of church and state and total exclusion of government aid to religion.'" The House and Senate immediately adopted the amendments approved in the Conference Report, ratification followed, and the wording remains to this day. Schwartz, *The Bill of Rights: A Documentary History* (1971), Volume II, p. 1159.

suffice for the purpose? How just wd it be in its principle? How noble in its exemplary sacrifice to the genius of the Constitution; and the divine right of conscience? Why should the expense of a religious worship be allowed for the Legislature, be paid by the public, more than that for the Ex. or Judiciary branch of the Govt.?" Pfeffer, *Church State and Religion* (rev. ed. 1967), p. 249

I have not dealt separately with the *appointment* of a chaplain, as distinguished from paying one. Whether the legislature can avoid advancing or inhibiting religion and excessive entanglement with religion by appointing a single chaplain on a continuing basis for year after year or even for a several-month session is problematical. I leave the matter where the Court of Appeals for the Eighth Circuit left it in *Bogen v. Doty*:

> "We would be less than candid if we did not warn the county of the quagmire it is near. Up to the time of oral argument, all persons delivering invocations were members of the Christian faith. We have no reason to believe that persons of any religious persuasions have volunteered and been turned down by the board. If in the future this should occur the board will be in a very difficult position to defend against an allegation that it is excessively entangled in religion by giving public approval to some groups while denying it to others. We will not speculate on what, if any, criteria the county might permissibly use in selecting speakers; we only suggest that the process might prove more burdensome in time and money than is justified by the benefits." 598 F.2d at 1114.

The members of the Executive Committee of the Legislative Council merely recommend the person to be appointed chaplain. They do not, so far as I can tell, direct payment for the chaplain or the printing of the prayer books. The lawsuit, therefore, should be dismissed as to them.

### JURISDICTION OF THE COURT

The action was filed under 42 U.S.C. § 1983, and the court has jurisdiction because of 28 U.S.C. § 1343(3).