## MARSH, NEBRASKA STATE TREASURER, ET AL. *v.* CHAMBERS

No. 82–23.   Argued April 20, 1983—Decided July 5, 1983

*Shanler D. Cronk*, Assistant Attorney General of Nebraska, argued the cause for petitioners. With him on the briefs was *Paul L. Douglas*, Attorney General.

*Herbert J. Friedman* argued the cause for respondent. With him on the brief were *Stephen L. Pevar, Burt Neuborne*, and *Charles S. Sims*.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether the Nebraska Legislature's practice of opening each legislative day with a prayer by a chaplain paid by the State violates the Establishment Clause of the First Amendment.

I

The Nebraska Legislature begins each of its sessions with a prayer offered by a chaplain who is chosen biennially by the Executive Board of the Legislative Council and paid out of

---

*Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, Kathryn A. Oberly, Leonard Schaitman*, and *Michael Jay Singer* filed a brief for the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Nathan Z. Dershowitz* and *Marc D. Stern* for the American Jewish Congress; by *David J. Eiseman, Justin J. Finger*, and *Jeffrey P. Sinensky* for the Anti-Defamation League of B'nai Brith; and by *Thomas P. Gies* for Jon Garth Murray et al.

*Lanny M. Proffer* filed a brief for the National Conference of State Legislatures as *amicus curiae*.

public funds.[1]  Robert E. Palmer, a Presbyterian minister, has served as chaplain since 1965 at a salary of $319.75 per month for each month the legislature is in session.

Ernest Chambers is a member of the Nebraska Legislature and a taxpayer of Nebraska.  Claiming that the Nebraska Legislature's chaplaincy practice violates the Establishment Clause of the First Amendment, he brought this action under 42 U. S. C. § 1983, seeking to enjoin enforcement of the practice.[2]  After denying a motion to dismiss on the ground of legislative immunity, the District Court held that the Establishment Clause was not breached by the prayers, but was violated by paying the chaplain from public funds.  504 F. Supp. 585 (Neb. 1980).  It therefore enjoined the legislature from using public funds to pay the chaplain; it declined to enjoin the policy of beginning sessions with prayers.  Cross-appeals were taken.[3]

The Court of Appeals for the Eighth Circuit rejected arguments that the case should be dismissed on Tenth Amendment, legislative immunity, standing, or federalism grounds. On the merits of the chaplaincy issue, the court refused to treat respondent's challenges as separable issues as the District Court had done.  Instead, the Court of Appeals assessed the practice as a whole because "[p]arsing out [the]

---

[1] Rules of the Nebraska Unicameral, Rules 1, 2, and 21.  These prayers are recorded in the Legislative Journal and, upon the vote of the legislature, collected from time to time into prayerbooks, which are published at public expense.  In 1975, 200 copies were printed; prayerbooks were also published in 1978 (200 copies), and 1979 (100 copies).  In total, publication costs amounted to $458.56.

[2] Respondent named as defendants State Treasurer Frank Marsh, Chaplain Palmer, and the members of the Executive Board of the Legislative Council in their official capacity.  All appear as petitioners before us.

[3] The District Court also enjoined the State from using public funds to publish the prayers, holding that this practice violated the Establishment Clause.  Petitioners have represented to us that they did not challenge this facet of the District Court's decision, Tr. of Oral Arg. 19–20.  Accordingly, no issue as to publishing these prayers is before us.

elements" would lead to "an incongruous result." 675 F. 2d 228, 233 (1982).

Applying the three-part test of *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971), as set out in *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 773 (1973), the court held that the chaplaincy practice violated all three elements of the test: the purpose and primary effect of selecting the same minister for 16 years and publishing his prayers was to promote a particular religious expression; use of state money for compensation and publication led to entanglement. 675 F. 2d, at 234–235. Accordingly, the Court of Appeals modified the District Court's injunction and prohibited the State from engaging in any aspect of its established chaplaincy practice.

We granted certiorari limited to the challenge to the practice of opening sessions with prayers by a state-employed clergyman, 459 U. S. 966 (1982), and we reverse.[4]

## II

The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom. In the very courtrooms in which the United States District Judge and later three Circuit Judges heard and decided this case, the proceedings opened with an announcement that concluded, "God save the United States and this Honorable Court." The same invocation occurs at all sessions of this Court.

---

[4] Petitioners also sought review of their Tenth Amendment, federalism, and immunity claims. They did not, however, challenge the Court of Appeals' decision as to standing and we agree that Chambers, as a member of the legislature and as a taxpayer whose taxes are used to fund the chaplaincy, has standing to assert this claim.

The tradition in many of the Colonies was, of course, linked to an established church,[5] but the Continental Congress, beginning in 1774, adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain. See, e. g., 1 J. Continental Cong. 26 (1774); 2 id., at 12 (1775); 5 id., at 530 (1776); 6 id., at 887 (1776); 27 id., at 683 (1784). See also 1 A. Stokes, Church and State in the United States 448–450 (1950). Although prayers were not offered during the Constitutional Convention,[6] the First Congress, as one of

---

[5] The practice in Colonies with established churches is, of course, not dispositive of the legislative prayer question. The history of Virginia is instructive, however, because that Colony took the lead in defining religious rights. In 1776, the Virginia Convention adopted a Declaration of Rights that included, as Article 16, a guarantee of religious liberty that is considered the precursor of both the Free Exercise and Establishment Clauses. 1 B. Schwartz, The Bill of Rights: A Documentary History 231–236 (1971); S. Cobb, The Rise of Religious Liberty in America 491–492 (1970). Virginia was also among the first to disestablish its church. Both before and after disestablishment, however, Virginia followed the practice of opening legislative sessions with prayer. See, e. g., J. House of Burgesses 34 (Nov. 20, 1712); Debates of the Convention of Virginia 470 (June 2, 1788) (ratification convention); J. House of Delegates of Va. 3 (June 24, 1788) (state legislature).

Rhode Island's experience mirrored that of Virginia. That Colony was founded by Roger Williams, who was among the first of his era to espouse the principle of religious freedom. Cobb, supra, at 426. As early as 1641, its legislature provided for liberty of conscience. Id., at 430. Yet the sessions of its ratification convention, like Virginia's, began with prayers, see W. Staples, Rhode Island in the Continental Congress, 1765–1790, p. 668 (1870) (reprinting May 26, 1790, minutes of the convention).

[6] History suggests that this may simply have been an oversight. At one point, Benjamin Franklin suggested that "henceforth prayers imploring the assistance of Heaven, and its blessings on our deliberations, be held in this Assembly every morning before we proceed to business." 1 M. Farrand, Records of the Federal Convention of 1787, p. 452 (1911). His proposal was rejected not because the Convention was opposed to prayer, but because it was thought that a midstream adoption of the policy would highlight prior omissions and because "[t]he Convention had no funds." Ibid.; see also Stokes, at 455–456.

its early items of business, adopted the policy of selecting a chaplain to open each session with prayer. Thus, on April 7, 1789, the Senate appointed a committee "to take under consideration the manner of electing Chaplains." S. Jour., 1st Cong., 1st Sess., 10 (1820 ed.). On April 9, 1789, a similar committee was appointed by the House of Representatives. On April 25, 1789, the Senate elected its first chaplain, id., at 16; the House followed suit on May 1, 1789, H. R. Jour., 1st Cong., 1st Sess., 26 (1826 ed.). A statute providing for the payment of these chaplains was enacted into law on September 22, 1789.[7] 2 Annals of Cong. 2180; § 4, 1 Stat. 71.[8]

On September 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights, S. Jour., supra, at 88; H. R. Jour., supra, at 121.[9] Clearly the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress.[10] It has also been followed con-

---

[7] The statute provided:

"[T]here shall be allowed to each chaplain of Congress . . . five hundred dollars per annum during the session of Congress."

This salary compares favorably with the Congressmen's own salaries of $6 for each day of attendance, 1 Stat. 70–71.

[8] It bears note that James Madison, one of the principal advocates of religious freedom in the Colonies and a drafter of the Establishment Clause, see, e. g., Cobb, supra n. 5, at 495–497; Stokes, at 537–552, was one of those appointed to undertake this task by the House of Representatives, H. R. Jour., at 11–12; Stokes, at 541–549, and voted for the bill authorizing payment of the chaplains, 1 Annals of Cong. 891 (1789).

[9] Interestingly, September 25, 1789, was also the day that the House resolved to request the President to set aside a Thanksgiving Day to acknowledge "the many signal favors of Almighty God," H. R. Jour., at 123. See also S. Jour., at 88.

[10] The chaplaincy was challenged in the 1850's by "sundry petitions praying Congress to abolish the office of chaplain," S. Rep. No. 376, 32d Cong., 2d Sess., 1 (1853). After consideration by the Senate Committee on the

sistently in most of the states,[11] including Nebraska, where the institution of opening legislative sessions with prayer was adopted even before the State attained statehood. Neb.

---

Judiciary, the Senate decided that the practice did not violate the Establishment Clause, reasoning that a rule permitting Congress to elect chaplains is not a law establishing a national church and that the chaplaincy was no different from Sunday Closing Laws, which the Senate thought clearly constitutional. In addition, the Senate reasoned that since prayer was said by the very Congress that adopted the Bill of Rights, the Founding Fathers could not have intended the First Amendment to forbid legislative prayer or viewed prayer as a step toward an established church. *Id.*, at 2–4. In any event, the 35th Congress abandoned the practice of electing chaplains in favor of inviting local clergy to officiate, see Cong. Globe, 35th Cong., 1st Sess., 14, 27–28 (1857). Elected chaplains were reinstituted by the 36th Congress, Cong. Globe, 36th Cong., 1st Sess., 162 (1859); *id.*, at 1016 (1860).

[11] See Brief for National Conference of State Legislatures as *Amicus Curiae*. Although most state legislatures begin their sessions with prayer, most do not have a formal rule requiring this procedure. But see, *e. g.*, Alaska Legislature Uniform Rules 11 and 17 (1981) (providing for opening invocation); Ark. Rule of Senate 18 (1983); Colo. Legislator's Handbook, H. R. Rule 44 (1982); Idaho Rules of H. R. and Joint Rules 2 and 4 (1982); Ind. H. R. Rule 10 (1983); Kan. Rule of Senate 4 (1983); Kan. Rule of H. R. 103 (1983); Ky. General Assembly H. Res. 2 (1982); La. Rules of Order, Senate Rule 10.1 (1983); La. Rules of Order, H. R. Rule 8.1 (1982); Me. Senate and House Register, Rule of H. R. 4 (1983); Md. Senate and House of Delegates Rules 1 (1982 and 1983); Mo. Rules of Legislature, Joint Rule 1–1 (1983); N. H. Manual for the General Court of N. H., Rule of H. R. 52(a) (1981); N. D. Senate and H. R. Rules 101 and 301 (1983); Ore. Rule of Senate 4.01 (1983); Ore. Rule of H. R. 4.01 (1983) (opening session only); 104 Pa. Code § 11.11 (1983), 107 Pa. Code § 21.17 (1983); S. D. Official Directory and Rules of Senate and H. R., Joint Rule of the Senate and House 4–1 (1983); Tenn. Permanent Rules of Order of the Senate 1 and 6 (1981–1982) (provides for admission into Senate chamber of the "Chaplain of the Day"); Tex. Rule of H. R. 2, § 6 (1983); Utah Rules of Senate and H. R. 4.04 (1983); Va. Manual of Senate and House of Delegates, Rule of Senate 21(a) (1982) (session opens with "period of devotions"); Wash. Permanent Rule of H. R. 15 (1983); Wyo. Rule of Senate 4–1 (1983); Wyo. Rule of H. R. 2–1 (1983). See also P. Mason, Manual of Legislative Procedure § 586(2) (1979).

Jour. of Council, General Assembly, 1st Sess., 16 (Jan. 22, 1855).

Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns.   In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent. An Act

> "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning."   *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 297 (1888).

In *Walz* v. *Tax Comm'n*, 397 U. S. 664, 678 (1970), we considered the weight to be accorded to history:

> "It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.   Yet an unbroken practice . . . is not something to be lightly cast aside."

No more is Nebraska's practice of over a century, consistent with two centuries of national practice, to be cast aside.   It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable.   In applying the First Amendment to the states through the Fourteenth Amendment, *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940), it would be incongruous to interpret that Clause as imposing more strin-

gent First Amendment limits on the states than the draftsmen imposed on the Federal Government.

This unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged. We conclude that legislative prayer presents no more potential for establishment than the provision of school transportation, *Everson* v. *Board of Education*, 330 U. S. 1 (1947), beneficial grants for higher education, *Tilton* v. *Richardson*, 403 U. S. 672 (1971), or tax exemptions for religious organizations, *Walz, supra*.

Respondent cites JUSTICE BRENNAN's concurring opinion in *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 237 (1963), and argues that we should not rely too heavily on "the advice of the Founding Fathers" because the messages of history often tend to be ambiguous and not relevant to a society far more heterogeneous than that of the Framers, *id.*, at 240. Respondent also points out that John Jay and John Rutledge opposed the motion to begin the first session of the Continental Congress with prayer. Brief for Respondent 60.[12]

We do not agree that evidence of opposition to a measure weakens the force of the historical argument; indeed it infuses it with power by demonstrating that the subject was considered carefully and the action not taken thoughtlessly, by force of long tradition and without regard to the problems posed by a pluralistic society. Jay and Rutledge specifically grounded their objection on the fact that the delegates to the Congress "were so divided in religious sentiments . . . that [they] could not join in the same act of worship." Their ob-

---

[12] It also could be noted that objections to prayer were raised, apparently successfully, in Pennsylvania while ratification of the Constitution was debated, Penn. Herald, Nov. 24, 1787, and that in the 1820's, Madison expressed doubts concerning the chaplaincy practice. See L. Pfeffer, Church, State, and Freedom 248–249 (rev. ed. 1967), citing Fleet, Madison's "Detached Memoranda," 3 Wm. & Mary Quarterly 534, 558–559 (1946).

jection was met by Samuel Adams, who stated that "he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country." C. Adams, Familiar Letters of John Adams and his Wife, Abigail Adams, during the Revolution 37–38, reprinted in Stokes, at 449.

This interchange emphasizes that the delegates did not consider opening prayers as a proselytizing activity or as symbolically placing the government's "official seal of approval on one religious view," cf. 675 F. 2d, at 234. Rather, the Founding Fathers looked at invocations as "conduct whose . . . effect . . . harmonize[d] with the tenets of some or all religions." *McGowan* v. *Maryland*, 366 U. S. 420, 442 (1961). The Establishment Clause does not always bar a state from regulating conduct simply because it "harmonizes with religious canons." *Id.*, at 462 (Frankfurter, J., concurring). Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to "religious indoctrination," see *Tilton, supra,* at 686; *Colo* v. *Treasurer & Receiver General,* 378 Mass. 550, 559, 392 N. E. 2d 1195, 1200 (1979), or peer pressure, compare *Abington, supra,* at 290 (BRENNAN, J., concurring).

In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country. As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952).

### III

We turn then to the question of whether any features of the Nebraska practice violate the Establishment Clause.

Beyond the bare fact that a prayer is offered, three points have been made: first, that a clergyman of only one denomination—Presbyterian—has been selected for 16 years;[13] second, that the chaplain is paid at public expense; and third, that the prayers are in the Judeo-Christian tradition.[14] Weighed against the historical background, these factors do not serve to invalidate Nebraska's practice.[15]

The Court of Appeals was concerned that Palmer's long tenure has the effect of giving preference to his religious views. We cannot, any more than Members of the Congresses of this century, perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church. To the contrary, the evidence indicates that Palmer was reappointed because his performance and personal qualities were acceptable to the body appointing him.[16] Palmer was not the only clergyman heard by the legislature; guest chaplains have officiated at the request of various legislators and as substitutes during Palmer's absences. Tr. of Oral Arg. 10. Absent proof that the chaplain's reappointment stemmed from an impermissible motive, we con-

---

[13] In comparison, the First Congress provided for the appointment of two chaplains of different denominations who would alternate between the two Chambers on a weekly basis, S. Jour., 1st Cong., 1st Sess., 12 (1820 ed.); H. R. Jour., 1st Cong., 1st Sess., 16 (1826 ed.).

[14] Palmer characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion." App. 75 and 87 (deposition of Robert E. Palmer). Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator. Id., at 49.

[15] It is also claimed that Nebraska's practice of collecting the prayers into books violates the First Amendment. Because the State did not appeal the District Court order enjoining further publications, see n. 3, supra, this issue is not before us and we express no opinion on it.

[16] Nebraska's practice is consistent with the manner in which the First Congress viewed its chaplains. Reports contemporaneous with the elections reported only the chaplains' names, and not their religions or church affiliations, see, e. g., 2 Gazette of the U. S. 18 (Apr. 25, 1789); 5 id., at 18 (Apr. 27, 1789) (listing nominees for Chaplain of the House); 6 id., at 23 (May 1, 1789). See also S. Rep. 376, supra n. 10, at 3.

clude that his long tenure does not in itself conflict with the Establishment Clause.[17]

Nor is the compensation of the chaplain from public funds a reason to invalidate the Nebraska Legislature's chaplaincy; remuneration is grounded in historic practice initiated, as we noted earlier, *supra*, at 788, by the same Congress that drafted the Establishment Clause of the First Amendment. The Continental Congress paid its chaplain, see, *e. g.*, 6 J. Continental Cong. 887 (1776), as did some of the states, see, *e. g.*, Debates of the Convention of Virginia 470 (June 26, 1788). Currently, many state legislatures and the United States Congress provide compensation for their chaplains, Brief for National Conference of State Legislatures as *Amicus Curiae* 3; 2 U. S. C. §§ 61d and 84–2 (1982 ed.); H. R. Res. 7, 96th Cong., 1st Sess. (1979).[18] Nebraska has paid its chaplain for well over a century, see 1867 Neb. Laws 85, §§ 2–4 (June 21, 1867), reprinted in Neb. Gen. Stat. 459 (1873). The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one,

---

[17] We note that Dr. Edward L. R. Elson served as Chaplain of the Senate of the United States from January 1969 to February 1981, a period of 12 years; Dr. Frederick Brown Harris served from February 1949 to January 1969, a period of 20 years. Senate Library, Chaplains of the Federal Government (rev. ed. 1982).

[18] The states' practices differ widely. Like Nebraska, several states choose a chaplain who serves for the entire legislative session. In other states, the prayer is offered by a different clergyman each day. Under either system, some states pay their chaplains and others do not. For States providing for compensation statutorily or by resolution, see, *e. g.*, Cal. Gov't Code Ann. §§ 9170, 9171, 9320 (West 1980), and S. Res. No. 6, 1983–1984 Sess.; Colo. H. R. J., 54th Gen. Assembly, 1st Sess., 17–19 (Jan. 5, 1983); Conn. Gen. Stat. Ann. § 2–9 (1983–1984); Ga. H. R. Res. No. 3, § 1(e) (1983); Ga. S. Res. No. 3, § 1(c) (1983); Iowa Code § 2.11 (1983); Mo. Rev. Stat. § 21.150 (1978); Nev. Rev. Stat. § 218.200 (1981); N. J. Stat. Ann. § 52:11–2 (West 1970); N. M. Const., Art. IV, § 9; Okla. Stat. Ann., Tit. 74, §§ 291.12 and 292.1 (West Supp. 1982–1983); Vt. Stat. Ann., Tit. 2, § 19 (Supp. 1982); Wis. Stat. Ann. § 13.125 (West Supp. 1982).

or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

We do not doubt the sincerity of those, who like respondent, believe that to have prayer in this context risks the beginning of the establishment the Founding Fathers feared. But this concern is not well founded, for as Justice Goldberg aptly observed in his concurring opinion in *Abington*, 374 U. S., at 308:

> "It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."

The unbroken practice for two centuries in the National Congress and for more than a century in Nebraska and in many other states gives abundant assurance that there is no real threat "while this Court sits," *Panhandle Oil Co.* v. *Mississippi ex rel. Knox*, 277 U. S. 218, 223 (1928) (Holmes, J., dissenting).

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Court today has written a narrow and, on the whole, careful opinion. In effect, the Court holds that officially sponsored legislative prayer, primarily on account of its "unique history," *ante*, at 791, is generally exempted from the First Amendment's prohibition against "an establishment of religion." The Court's opinion is consistent with dictum in at least one of our prior decisions,[1] and its limited rationale should pose little threat to the overall fate of the Establishment Clause. Moreover, disagreement with the Court

---

[1] See *Zorach* v. *Clauson*, 343 U. S. 306, 312–313 (1952); cf. *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 213 (1963).

requires that I confront the fact that some 20 years ago, in a concurring opinion in one of the cases striking down official prayer and ceremonial Bible reading in the public schools, I came very close to endorsing essentially the result reached by the Court today.[2]  Nevertheless, after much reflection, I have come to the conclusion that I was wrong then and that the Court is wrong today.   I now believe that the practice of official invocational prayer, as it exists in Nebraska and most other state legislatures, is unconstitutional.   It is contrary to the doctrine as well the underlying purposes of the Establishment Clause, and it is not saved either by its history or by any of the other considerations suggested in the Court's opinion.

I respectfully dissent.

## I

The Court makes no pretense of subjecting Nebraska's practice of legislative prayer to any of the formal "tests" that have traditionally structured our inquiry under the Establishment Clause.   That it fails to do so is, in a sense, a good thing, for it simply confirms that the Court is carving out an exception to the Establishment Clause rather than reshaping Establishment Clause doctrine to accommodate legislative prayer.   For my purposes, however, I must begin by demonstrating what should be obvious: that, if the Court were to judge legislative prayer through the unsentimental eye of our settled doctrine, it would have to strike it down as a clear violation of the Establishment Clause.

The most commonly cited formulation of prevailing Establishment Clause doctrine is found in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971):

---

[2] "The saying of invocational prayers in legislative chambers, state or federal, and the appointment of legislative chaplains, might well represent no involvements of the kind prohibited by the Establishment Clause. Legislators, federal and state, are mature adults who may presumably absent themselves from such public and ceremonial exercises without incurring any penalty, direct or indirect." *Schempp, supra,* at 299–300 (BRENNAN, J., concurring) (footnote omitted).

"Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute [at issue] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Id.*, at 612–613 (citations omitted).[3]

That the "purpose" of legislative prayer is pre-eminently religious rather than secular seems to me to be self-evident.[4] "To invoke Divine guidance on a public body entrusted with making the laws," *ante*, at 792, is nothing but a religious act. Moreover, whatever secular functions legislative prayer might play—formally opening the legislative session, getting the members of the body to quiet down, and imbuing them with a sense of seriousness and high purpose—could so plainly be performed in a purely nonreligious fashion that to claim a secular purpose for the prayer is an insult to the per-

---

[3] See, *e. g., Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 123 (1982); *Widmar* v. *Vincent*, 454 U. S. 263, 271 (1981); *Wolman* v. *Walter*, 433 U. S. 229, 236 (1977); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 772–773 (1973).

[4] See *Stone* v. *Graham*, 449 U. S. 39, 41 (1980) (finding "pre-eminent purpose" of state statute requiring posting of Ten Commandments in each public school classroom to be "plainly religious in nature," despite legislative recitations of "supposed secular purpose"); *Epperson* v. *Arkansas*, 393 U. S. 97, 107–109 (1968) (state "anti-evolution" statute clearly religious in purpose); cf. *Schempp*, *supra*, at 223–224 (public school exercise consisting of Bible reading and recitation of Lord's Prayer).

As Reverend Palmer put the matter: "I would say that I strive to relate the Senators and their helpers to the divine." Palmer Deposition, at 28. "[M]y purpose is to provide an opportunity for Senators to be drawn closer to their understanding of God as they understand God. In order that the divine wisdom might be theirs as they conduct their business for the day." *Id.*, at 46. Cf. Prayers of the Chaplain of the Massachusetts Senate, 1963–1968, p. 58 (1969) (hereinafter Massachusetts Senate Prayers) ("Save this moment, O God, from merely being a gesture to custom").

fectly honorable individuals who instituted and continue the practice.

The "primary effect" of legislative prayer is also clearly religious. As we said in the context of officially sponsored prayers in the public schools, "prescribing a particular form of religious worship," even if the individuals involved have the choice not to participate, places "indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion . . . ." *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962).[5] More importantly, invocations in Nebraska's legislative halls explicitly link religious belief and observance to the power and prestige of the State. "[T]he mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 125–126 (1982).[6] See *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 224 (1963).

Finally, there can be no doubt that the practice of legislative prayer leads to excessive "entanglement" between the State and religion. *Lemon* pointed out that "entanglement" can take two forms: First, a state statute or program might involve the state impermissibly in monitoring and overseeing

---

[5] Cf. *Stone* v. *Graham, supra,* at 42.

The Court argues that legislators are adults, "presumably not readily susceptible to . . . peer pressure." *Ante,* at 792. I made a similar observation in my concurring opinion in *Schempp.* See n. 2, *supra.* Quite apart from the debatable constitutional significance of this argument, see *Schempp,* 374 U. S., at 224–225; *Engel* v. *Vitale,* 370 U. S., at 430, I am now most uncertain as to whether it is even factually correct: Legislators, by virtue of their instinct for political survival, are often loath to assert in public religious views that their constituents might perceive as hostile or nonconforming. See generally P. Blanshard, God and Man in Washington 94–106 (1960).

[6] As I point out *infra,* at 803–804, 808, official religious exercises may also be of significant symbolic *detriment* to religion.

religious affairs. 403 U. S., at 614–622.[7]  In the case of legislative prayer, the process of choosing a "suitable" chaplain, whether on a permanent or rotating basis, and insuring that the chaplain limits himself or herself to "suitable" prayers, involves precisely the sort of supervision that agencies of government should if at all possible avoid.[8]

Second, excessive "entanglement" might arise out of "the divisive political potential" of a state statute or program. 403 U. S., at 622.

> "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect.  The potential divisiveness of such conflict is a threat to the normal political process." *Ibid.* (citations omitted).

In this case, this second aspect of entanglement is also clear. The controversy between Senator Chambers and his colleagues, which had reached the stage of difficulty and rancor long before this lawsuit was brought, has split the Nebraska

---

[7] See *Larkin* v. *Grendel's Den, Inc., supra,* at 125, n. 9; *Walz* v. *Tax Comm'n,* 397 U. S. 664, 674–676 (1970).

[8] In *Lemon,* we struck down certain state statutes providing aid to sectarian schools, in part because "the program requires the government to examine the school's records in order to determine how much of the total expenditures is attributable to secular education and how much to religious activity."  403 U. S., at 620.  In this case, by the admission of the very government officials involved, supervising the practice of legislative prayer requires those officials to determine if particular members of the clergy and particular prayers are "too explicitly Christian," App. 49 (testimony of Rev. Palmer) or consistent with "the various religious preferences that the Senators may or may not have," *id.,* at 48 (same), or likely to "inject some kind of a religious dogma" into the proceedings, *id.,* at 68 (testimony of Frank Lewis, Chairman of the Nebraska Legislature Executive Board).

Legislature precisely on issues of religion and religious conformity. App. 21–24. The record in this case also reports a series of instances, involving legislators other than Senator Chambers, in which invocations by Reverend Palmer and others led to controversy along religious lines.[9] And in general, the history of legislative prayer has been far more eventful—and divisive—than a hasty reading of the Court's opinion might indicate.[10]

In sum, I have no doubt that, if any group of law students were asked to apply the principles of *Lemon* to the question

---

[9] See *id.*, at 49 (testimony of Rev. Palmer) (discussing objections raised by some Senators to Christological references in certain of his prayers and in a prayer offered by a guest member of the clergy).

[10] As the Court points out, the practice of legislative prayers in Congress gave rise to serious controversy at points in the 19th century. *Ante,* at 788–789, n. 10. Opposition to the practice in that period arose "both on the part of certain radicals and of some rather extreme Protestant sects. These have been inspired by very different motives but have united in opposing government chaplaincies as breaking down the line of demarcation between Church and State. The sectarians felt that religion had nothing to do with the State, while the radicals felt that the State had nothing to do with religion." 3 A. Stokes, Church and State in the United States 130 (1950) (hereinafter Stokes). See also *id.*, at 133–134. Similar controversies arose in the States. See Report of the Select Committee of the New York State Assembly on the Several Memorials Against Appointing Chaplains to the Legislature (1832) (recommending that practice be abolished), reprinted in J. Blau, Cornerstones of Religious Freedom in America 141–156 (1949).

In more recent years, particular prayers and particular chaplains in the state legislatures have periodically led to serious political divisiveness along religious lines. See, *e. g.*, The Oregonian, Apr. 1, 1983, p. C8 ("Despite protests from at least one representative, a follower of an Indian guru was allowed to give the prayer at the start of Thursday's [Oregon] House [of Representatives] session. Shortly before Ma Anand Sheela began the invocation, about a half-dozen representatives walked off the House floor in apparent protest of the prayer"); Cal. Senate Jour., 37th Sess., 171–173, 307–308 (1907) (discussing request by a State Senator that State Senate Chaplain not use the name of Christ in legislative prayer, and response by one local clergyman claiming that the legislator who made the request had committed a "crowning infamy" and that his "words were those of an irreverent and godless man"). See also *infra,* at 805–806, 808, 818–821.

of legislative prayer, they would nearly unanimously find the practice to be unconstitutional.[11]

## II

The path of formal doctrine, however, can only imperfectly capture the nature and importance of the issues at stake in this case.  A more adequate analysis must therefore take

---

[11] The *Lemon* tests do not, of course, exhaust the set of formal doctrines that can be brought to bear on the issues before us today.  Last Term, for example, we made clear that a state program that discriminated *among* religious faiths, and not merely in favor of all religious faiths, "must be invalidated unless it is justified by a compelling governmental interest, cf. *Widmar* v. *Vincent*, 454 U. S. 263, 269–270 (1981), and unless it is closely fitted to further that interest, *Murdock* v. *Pennsylvania*, 319 U. S. 105, 116–117 (1943)." *Larson* v. *Valente*, 456 U. S. 228, 247 (1982).  In this case, the appointment of a single chaplain for 16 years, and the evident impossibility of a Buddhist monk or Sioux Indian religious worker being appointed for a similar period, App. 69–70, see *post*, p. 822 (STEVENS, J., dissenting), might well justify application of the *Larson* test.  Moreover, given the pains that petitioners have gone through to emphasize the "ceremonial" function of legislative prayer, Brief for Petitioners 16, and given the ease with which a similar "ceremonial" function could be performed without the necessity for prayer, cf. *supra*, at 797–798, I have little doubt that the Nebraska practice, at least, would fail the *Larson* test.

In addition, I still find compelling the Establishment Clause test that I articulated in *Schempp:*

"What the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice." 374 U. S., at 294–295.

See *Roemer* v. *Maryland Board of Public Works*, 426 U. S. 736, 770–771 (1976) (BRENNAN, J., dissenting); *Hunt* v. *McNair*, 413 U. S. 734, 750 (1973) (BRENNAN, J., dissenting); *Lemon* v. *Kurtzman*, 403 U. S., at 643 (BRENNAN, J., concurring); *Walz* v. *Tax Comm'n*, 397 U. S., at 680–681 (BRENNAN, J., concurring).  For reasons similar to those I have already articulated, I believe that the Nebraska practice of legislative prayer, as well as most other comparable practices, would fail at least the second and third elements of this test.

into account the underlying function of the Establishment Clause, and the forces that have shaped its doctrine.

## A

Most of the provisions of the Bill of Rights, even if they are not generally enforceable in the absence of state action, nevertheless arise out of moral intuitions applicable to individuals as well as governments. The Establishment Clause, however, is quite different. It is, to its core, nothing less and nothing more than a statement about the proper role of *government* in the society that we have shaped for ourselves in this land.

The Establishment Clause embodies a judgment, born of a long and turbulent history, that, in our society, religion "must be a private matter for the individual, the family, and the institutions of private choice . . . ." *Lemon* v. *Kurtzman*, 403 U. S., at 625.

> "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and non-religion." *Epperson* v. *Arkansas*, 393 U. S. 97, 103–104 (1968) (footnote omitted).

"In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'" *Everson* v. *Board of Education*, 330 U. S. 1, 16 (1947), quoting *Reynolds* v. *United States*, 98 U. S. 145, 164 (1879).[12]

---

[12] See also, *e. g.*, *Larkin* v. *Grendel's Den, Inc.*, 459 U. S., at 122–123; *Stone* v. *Graham*, 449 U. S., at 42; *Abington School Dist.* v. *Schempp*, 374 U. S., at 214–225; *id.*, at 232–234, 243–253 (BRENNAN, J., concurring).

The principles of "separation" and "neutrality" implicit in the Establishment Clause serve many purposes. Four of these are particularly relevant here.

The first, which is most closely related to the more general conceptions of liberty found in the remainder of the First Amendment, is to guarantee the individual right to conscience.[13] The right to conscience, in the religious sphere, is not only implicated when the government engages in direct or indirect coercion. It is also implicated when the government requires individuals to support the practices of a faith with which they do not agree.

> "'[T]o compel a man to furnish contributions of money for the propagation of [religious] opinions which he disbelieves, is sinful and tyrannical; . . . even . . . forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern . . . .'" *Everson* v. *Board of Education, supra,* at 13, quoting Virginia Bill for Religious Liberty, 12 Hening, Statutes of Virginia 84 (1823).

The second purpose of separation and neutrality is to keep the state from interfering in the essential autonomy of religious life, either by taking upon itself the decision of reli-

---

[13] See, *e. g., Larson* v. *Valente, supra,* at 244–247; *Schempp, supra,* at 222; *Torcaso* v. *Watkins,* 367 U. S. 488, 490, 494–496 (1961); *McDaniel* v. *Paty,* 435 U. S. 618, 636 (1978) (BRENNAN, J., concurring in judgment).

The Free Exercise Clause serves a similar function, though often in a quite different way. In particular, we have held that, under certain circumstances, an otherwise constitutional law may not be applied as against persons for whom the law creates a burden on religious belief or practice. See, *e. g., Thomas* v. *Review Bd. of Indiana Employment Security Division,* 450 U. S. 707 (1981); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *Sherbert* v. *Verner,* 374 U. S. 398 (1963).

gious issues,[14] or by unduly involving itself in the supervision of religious institutions or officials.[15]

The third purpose of separation and neutrality is to prevent the trivialization and degradation of religion by too close an attachment to the organs of government. The Establishment Clause "stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel* v. *Vitale*, 370 U. S., at 432, quoting Memorial and Remonstrance against Religious Assessments, 2 Writings of Madison 187. See also *Schempp*, 374 U. S., at 221–222; *id.*, at 283–287 (BRENNAN, J., concurring).[16]

---

[14] See, *e. g.*, *Presbyterian Church* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U. S. 440 (1969); *United States* v. *Ballard*, 322 U. S. 78 (1944).

[15] See *Lemon* v. *Kurtzman*, 403 U. S., at 614–622; *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 501–504 (1979).

This and the remaining purposes that I discuss cannot be reduced simply to a question of individual liberty. A court, for example, will refuse to decide an essentially religious issue even if the issue is otherwise properly before the court, and even if it is asked to decide it.

[16] Consider, in addition to the formal authorities cited in text, the following words by a leading Methodist clergyman:

"[Some propose] to reassert religious values by posting the Ten Commandments on every school-house wall, by erecting cardboard nativity shrines on every corner, by writing God's name on our money, and by using His Holy Name in political oratory. Is this not the ultimate in profanity?

. . . . . . . . . . . .

"What is the result of all this display of holy things in public places? Does it make the market-place more holy? Does it improve people? Does it change their character or motives? On the contrary, the sacred symbols are thereby cheapened and degraded. The effect is often that of a television commercial on a captive audience—boredom and resentment." Kelley, *Beyond Separation of Church and State*, 5 J. Church & State 181, 190–191 (1963).

Consider also this condensed version of words first written in 1954 by one observer of the American scene:

"The manifestations of religion in Washington have become pretty thick. We have had opening prayers, Bible breakfasts, [and so on]; now we have

Finally, the principles of separation and neutrality help assure that essentially religious issues, precisely because of their importance and sensitivity, not become the occasion for battle in the political arena. See *Lemon*, 403 U. S., at 622–624; *Board of Education* v. *Allen*, 392 U. S. 236, 249 (Harlan, J., concurring); *Engel, supra*, at 429–430. With regard to most issues, the government may be influenced by partisan argument and may act as a partisan itself. In each case, there will be winners and losers in the political battle, and the losers' most common recourse is the right to dissent and the right to fight the battle again another day. With regard to matters that are essentially religious, however, the Establishment Clause seeks that there should be no political battles, and that no American should at any point feel alien-

---

added . . . a change in the Pledge of Allegiance. The Pledge, which has served well enough in times more pious than ours, has now had its rhythm upset but its anti-Communist spirituality improved by the insertion of the phrase 'under God.' . . . A bill has been introduced directing the post office to cancel mail with the slogan 'Pray for Peace.' (The devout, in place of daily devotions, can just read what is stuck and stamped all over the letters in their mail.)

.           .           .           .           .

"To note all this in a deflationary tone is not to say that religion and politics don't mix. Politicians should develop deeper religious convictions, and religious folk should develop wiser political convictions; both need to relate political duties to religious faith—but not in an unqualified and public way that confuses the absolute and emotional loyalties of religion with the relative and shifting loyalties of politics.

.           .           .           .           .

"All religious affirmations are in danger of standing in contradiction to the life that is lived under them, but none more so than these general, inoffensive, and externalized ones which are put together for public purposes." W. Miller, Piety along the Potomac 41–46 (1964).

See also, *e. g.*, Prayer in Public Schools and Buildings—Federal Court Jurisdiction, Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 96th Cong., 2d Sess., 46–47 (1980) (testimony of M. William Howard, President of the National Council of the Churches of Christ in the U. S. A.) (hereinafter Hearings); cf. Fox, The National Day of Prayer, 29 Theology Today 258 (1972).

ated from his government because that government has declared or acted upon some "official" or "authorized" point of view on a matter of religion.[17]

## B

The imperatives of separation and neutrality are not limited to the relationship of government to religious institutions or denominations, but extend as well to the relationship of government to religious beliefs and practices. In *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), for example, we struck down a state provision requiring a religious oath as a qualification to hold office, not only because it violated principles of free exercise of religion, but also because it violated the principles of nonestablishment of religion. And, of course, in the pair of cases that hang over this one like a reproachful set of parents, we held that official prayer and prescribed Bible reading in the public schools represent a serious encroachment on the Establishment Clause. *Schempp, supra; Engel, supra.* As we said in *Engel*, "[i]t is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." 370 U. S., at 435 (footnote omitted).

Nor should it be thought that this view of the Establishment Clause is a recent concoction of an overreaching judi-

---

[17] It is sometimes argued that to apply the Establishment Clause alienates those who wish to see a tighter bond between religion and state. This is obviously true. (I would vigorously deny, however, any claim that the Establishment Clause disfavors the much broader class of persons for whom religion is a necessary and important part of life. See *supra*, at 803–804; *infra*, at 821–822.) But I would submit that even this dissatisfaction is tempered by the knowledge that society is adhering to a fixed rule of neutrality rather than rejecting a particular expression of religious belief.

ciary. Even before the First Amendment was written, the Framers of the Constitution broke with the practice of the Articles of Confederation and many state constitutions, and did not invoke the name of God in the document. This "omission of a reference to the Deity was not inadvertent; nor did it remain unnoticed." [18] Moreover, Thomas Jefferson and Andrew Jackson, during their respective terms as President, both refused on Establishment Clause grounds to declare national days of thanksgiving or fasting. [19] And James Madison, writing subsequent to his own Presidency on essentially the very issue we face today, stated:

> "Is the appointment of Chaplains to the two Houses of Congress consistent with the Constitution, and with the pure principle of religious freedom?
>
> "In strictness, the answer on both points must be in the negative. The Constitution of the U. S. forbids everything like an establishment of a national religion. The law appointing Chaplains establishes a religious worship for the national representatives, to be performed by Ministers of religion, elected by a majority of

---

[18] Pfeffer, The Deity in American Constitutional History, 23 J. Church & State 215, 217 (1981). See also 1 Stokes 523.

[19] See L. Pfeffer, Church, State, and Freedom 266 (rev. ed. 1967) (hereinafter Pfeffer). Jefferson expressed his views as follows:

"'I consider the government of the United States as interdicted by the Constitution from intermeddling with religious institutions, their doctrines, discipline, or exercises. [I]t is only proposed that I should recommend not prescribe a day of fasting and prayer. [But] I do not believe it is for the interest of religion to invite the civil magistrate to direct its exercises, its discipline, or its doctrine . . . . Fasting and prayer are religious exercises; the enjoining of them an act of discipline. Every religious society has a right to determine for itself the times for these exercises, and the objects proper for them, according to their own particular tenets; and the right can never be safer than in their hands, where the Constitution has deposited it.'" Ibid., quoting 11 Jefferson's Writings 428–430 (Monticello ed. 1905).

them; and these are to be paid out of the national taxes. Does not this involve the principle of a national establishment, applicable to a provision for a religious worship for the Constituent as well as of the representative Body, approved by the majority, and conducted by Ministers of religion paid by the entire nation." Fleet, Madison's "Detached Memoranda," 3 Wm. & Mary Quarterly 534, 558 (1946).

C

Legislative prayer clearly violates the principles of neutrality and separation that are embedded within the Establishment Clause. It is contrary to the fundamental message of *Engel* and *Schempp*. It intrudes on the right to conscience by forcing some legislators either to participate in a "prayer opportunity," *ante*, at 794, with which they are in basic disagreement, or to make their disagreement a matter of public comment by declining to participate. It forces all residents of the State to support a religious exercise that may be contrary to their own beliefs. It requires the State to commit itself on fundamental theological issues.[20] It has the potential for degrading religion by allowing a religious call to worship to be intermeshed with a secular call to order. And it injects religion into the political sphere by creating the potential that each and every selection of a chaplain, or consideration of a particular prayer, or even reconsideration of the practice itself, will provoke a political battle along religious lines and ultimately alienate some religiously identified group of citizens.[21]

---

[20] See also *infra*, at 819–821.

[21] In light of the discussion in text, I am inclined to agree with the Court that the Nebraska practice of legislative prayer is not significantly more troubling than that found in other States. For example, appointing one chaplain for 16 years may give the impression of "establishing" one particular religion, but the constant attention to the selection process which would be the result of shorter terms might well increase the opportunity for reli-

## D

One response to the foregoing account, of course, is that "neutrality" and "separation" do not exhaust the full meaning of the Establishment Clause as it has developed in our cases. It is indeed true that there are certain tensions inherent in the First Amendment itself, or inherent in the role of religion and religious belief in any free society, that have shaped the doctrine of the Establishment Clause, and required us to deviate from an absolute adherence to separation and neutrality. Nevertheless, these considerations, although very important, are also quite specific, and where none of them is present, the Establishment Clause gives us no warrant simply to look the other way and treat an unconstitutional practice as if it were constitutional. Because the Court occasionally suggests that some of these considerations might apply here, it becomes important that I briefly identify the most prominent of them and explain why they do not in fact have any relevance to legislative prayer.

## (1)

A number of our cases have recognized that religious institutions and religious practices may, in certain contexts, receive the benefit of government programs and policies generally available, on the basis of some secular criterion, to a wide class of similarly situated nonreligious beneficiaries,[22] and the precise cataloging of those contexts is not necessarily an easy task. I need not tarry long here, however, because the provision for a daily official invocation by a nonmember officer of

gious discord and entanglement. The lesson I draw from all this, however, is that any regular practice of official invocational prayer must be deemed unconstitutional.

[22] See, e. g., Everson v. Board of Education, 330 U. S. 1 (1947) (transportation of students to and from school); Walz v. Tax Comm'n, 397 U. S. 664 (1970) (charitable tax exemptions).

a legislative body could by no stretch of the imagination appear anywhere in that catalog.

### (2)

Conversely, our cases have recognized that religion can encompass a broad, if not total, spectrum of concerns, overlapping considerably with the range of secular concerns, and that not every governmental act which coincides with or conflicts with a particular religious belief is for that reason an establishment of religion. See, *e. g.*, *McGowan* v. *Maryland*, 366 U. S. 420, 431–445 (1961) (Sunday Laws); *Harris* v. *McRae*, 448 U. S. 297, 319–320 (1980) (abortion restrictions). The Court seems to suggest at one point that the practice of legislative prayer may be excused on this ground, *ante*, at 792, but I cannot really believe that it takes this position seriously.[23] The practice of legislative prayer is nothing like the statutes we considered in *McGowan* and *Harris* v. *McRae;* prayer is not merely "conduct whose . . . effect . . . harmonize[s] with the tenets of some or all religions," *McGowan, supra*, at 442; prayer is fundamentally and necessarily religious. "It is prayer which distinguishes religious phenomena from all those which resemble them or lie near to them, from the moral sense, for instance, or aesthetic feeling."[24] Accord, *Engel*, 370 U. S., at 424.

### (3)

We have also recognized that government cannot, without adopting a decidedly *anti*-religious point of view, be forbid-

---

[23] The Court does sensibly, if not respectfully, ascribe this view to the Founding Fathers rather than to itself. See *ante*, at 792.

[24] A. Sabatier, Outlines of a Philosophy of Religion 25–26 (T. Seed trans., 1957 ed.). See also, *e. g.*, W. James, The Varieties of Religious Experience 352–353 (New American Library ed., 1958); F. Heiler, Prayer xiii–xvi (S. McComb trans., 1958 ed.).

den to recognize the religious beliefs and practices of the American people as an aspect of our history and culture.[25] Certainly, bona fide classes in comparative religion can be offered in the public schools.[26] And certainly, the text of Abraham Lincoln's Second Inaugural Address which is inscribed on a wall of the Lincoln Memorial need not be purged of its profound theological content. The practice of offering invocations at legislative sessions cannot, however, simply be dismissed as "a tolerable *acknowledgment of beliefs* widely held among the people of this country." *Ante*, at 792 (emphasis added). "Prayer is religion *in act*."[27] "Praying means to take hold of a word, the end, so to speak, of a line that leads to God."[28] Reverend Palmer and other members of the clergy who offer invocations at legislative sessions are not museum pieces put on display once a day for the edification of the legislature. Rather, they are engaged by the legislature to lead it—as a body—in an act of religious worship. If upholding the practice requires denial of this fact, I suspect that many supporters of legislative prayer would feel that they had been handed a pyrrhic victory.

## (4)

Our cases have recognized that the purposes of the Establishment Clause can sometimes conflict. For example, in *Walz* v. *Tax Comm'n*, 397 U. S. 664 (1970), we upheld tax exemptions for religious institutions in part because subjecting those institutions to taxation might foster serious administrative entanglement. *Id.*, at 674–676. Here, however, no

---

[25] See *Schempp*, 374 U. S., at 300–304 (BRENNAN, J., concurring); *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 235–236 (1948) (Jackson, J., concurring).

[26] See *Schempp, supra*, at 225.

[27] Sabatier, *supra*, at 25 (emphasis added).

[28] A. Heschel, Man's Quest for God 30 (1954).

such tension exists; the State can vindicate *all* the purposes of the Establishment Clause by abolishing legislative prayer.

### (5)

Finally, our cases recognize that, in one important respect, the Constitution is *not* neutral on the subject of religion: Under the Free Exercise Clause, religiously motivated claims of conscience may give rise to constitutional rights that other strongly held beliefs do not. See n. 13, *supra.* Moreover, even when the government is not compelled to do so by the Free Exercise Clause, it may to some extent act to facilitate the opportunities of individuals to practice their religion.[29] See *Schempp*, 374 U. S., at 299 (BRENNAN, J., concurring) ("hostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion"). This is not, however, a case in which a State is accommodating individual religious interests. We are not faced here with the right of the legislature to allow its members to offer prayers during the course of

---

[29] Justice Douglas' famous observation that "[w]e are a religious people whose institutions presuppose a Supreme Being," *Zorach* v. *Clauson*, 343 U. S., at 313, see *ante*, at 792, arose in precisely such a context. Indeed, a more complete quotation from the paragraph in which that statement appears is instructive here:

"We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. . . . The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. No more than that is undertaken here." 343 U. S., at 313–314.

general legislative debate. We are certainly not faced with the right of legislators to form voluntary groups for prayer or worship. We are not even faced with the right of the State to employ members of the clergy to minister to the private religious needs of individual legislators. Rather, we are faced here with the regularized practice of conducting official prayers, on behalf of the entire legislature, as part of the order of business constituting the formal opening of every single session of the legislative term. If this is free exercise, the Establishment Clause has no meaning whatsoever.

## III

With the exception of the few lapses I have already noted, each of which is commendably qualified so as to be limited to the facts of this case, the Court says almost nothing contrary to the above analysis. Instead, it holds that "the practice of opening legislative sessions with prayer has become part of the fabric of our society," *ante*, at 792, and chooses not to interfere. I sympathize with the Court's reluctance to strike down a practice so prevalent and so ingrained as legislative prayer. I am, however, unconvinced by the Court's arguments, and cannot shake my conviction that legislative prayer violates both the letter and the spirit of the Establishment Clause.

### A

The Court's main argument for carving out an exception sustaining legislative prayer is historical. The Court cannot—and does not—purport to find a pattern of "undeviating acceptance," *Walz, supra,* at 681 (BRENNAN, J., concurring), of legislative prayer. See *ante,* at 791, and n. 12; n. 10, *supra.* It also disclaims exclusive reliance on the mere longevity of legislative prayer. *Ante,* at 790. The Court does, however, point out that, only three days before the First Congress reached agreement on the final wording of the Bill of Rights, it authorized the appointment of paid chaplains for

its own proceedings, *ante*, at 788, and the Court argues that in light of this "unique history," *ante*, at 791, the actions of Congress reveal its intent as to the meaning of the Establishment Clause, *ante*, at 788–790. I agree that historical practice is "of considerable import in the interpretation of abstract constitutional language," *Walz*, 397 U. S., at 681 (BRENNAN, J., concurring). This is a case, however, in which—absent the Court's invocation of history—there would be no question that the practice at issue was unconstitutional. And despite the surface appeal of the Court's argument, there are at least three reasons why specific historical practice should not in this case override that clear constitutional imperative.[30]

First, it is significant that the Court's historical argument does not rely on the legislative history of the Establishment Clause itself. Indeed, that formal history is profoundly unilluminating on this and most other subjects. Rather, the Court assumes that the Framers of the Establishment Clause would not have themselves authorized a practice that they thought violated the guarantees contained in the Clause. *Ante*, at 790. This assumption, however, is questionable. Legislators, influenced by the passions and exigencies of the moment, the pressure of constituents and colleagues, and the press of business, do not always pass sober constitutional judgment on every piece of legislation they enact,[31] and this

---

[30] Indeed, the sort of historical argument made by the Court should be advanced with some hesitation in light of certain other skeletons in the congressional closet. See, *e. g.*, An Act for the Punishment of certain Crimes against the United States, § 16, 1 Stat. 116 (1790) (enacted by the First Congress and requiring that persons convicted of certain theft offenses "be publicly whipped, not exceeding thirty-nine stripes"); Act of July 23, 1866, 14 Stat. 216 (reaffirming the racial segregation of the public schools in the District of Columbia; enacted exactly one week after Congress proposed Fourteenth Amendment to the States).

[31] See generally D. Morgan, Congress and the Constitution (1966); E. Eidenberg & R. Morey, An Act of Congress (1969); cf. C. Miller, The Supreme Court and the Uses of History 61–64 (1969).

One commentator has pointed out that the chaplaincy established by the First Congress was "a carry-over from the days of the Continental Con-

must be assumed to be as true of the Members of the First Congress as any other. Indeed, the fact that James Madison, who voted for the bill authorizing the payment of the first congressional chaplains, *ante*, at 788, n. 8, later expressed the view that the practice was unconstitutional, see *supra*, at 807–808, is instructive on precisely this point. Madison's later views may not have represented so much a change of *mind* as a change of *role*, from a Member of Congress engaged in the hurly-burly of legislative activity to a detached observer engaged in unpressured reflection. Since the latter role is precisely the one with which this Court is charged, I am not at all sure that Madison's later writings should be any less influential in our deliberations than his earlier vote.

Second, the Court's analysis treats the First Amendment simply as an Act of Congress, as to whose meaning the intent of Congress is the single touchstone. Both the Constitution and its Amendments, however, became supreme law only by virtue of their ratification by the States, and the understanding of the States should be as relevant to our analysis as the understanding of Congress.[32] See *Richardson* v. *Ramirez*, 418 U. S. 24, 43 (1974); *Maxwell* v. *Dow*, 176 U. S. 581, 602 (1900).[33] This observation is especially compelling in consid-

gress, which . . . exercised plenary jurisdiction in matters of religion; and ceremonial practices such as [this] are not easily dislodged after becoming so firmly established." Pfeffer 170.

[32] As a practical matter, "we know practically nothing about what went on in the state legislatures" during the process of ratifying the Bill of Rights. 2 B. Schwartz, The Bill of Rights: A Documentary History 1171 (1971). Moreover, looking to state practices is, as the Court admits, *ante*, at 787, n. 5, of dubious relevance because the Establishment Clause did not originally apply to the States. Nevertheless, these difficulties give us no warrant to give controlling weight on the constitutionality of a specific practice to the collateral acts of the Members of Congress who proposed the Bill of Rights to the States.

[33] See also 1 J. Story, Commentaries on the Constitution § 406 (1st ed., 1833); Fleet, Madison's "Detached Memoranda," 3 Wm. & Mary Quarterly 534, 544 (1946); Wofford, The Blinding Light: The Uses of History in Constitutional Interpretation, 31 U. Chi. L. Rev. 502, 508–509 (1964).

ering the meaning of the Bill of Rights. The first 10 Amendments were not enacted because the Members of the First Congress came up with a bright idea one morning; rather, their enactment was forced upon Congress by a number of the States as a condition for their ratification of the original Constitution.[34] To treat any practice authorized by the First Congress as presumptively consistent with the Bill of Rights is therefore somewhat akin to treating any action of a party to a contract as presumptively consistent with the terms of the contract. The latter proposition, if it were accepted, would of course resolve many of the heretofore perplexing issues in contract law.

Finally, and most importantly, the argument tendered by the Court is misguided because the Constitution is not a static document whose meaning on every detail is fixed for all time by the life experience of the Framers. We have recognized in a wide variety of constitutional contexts that the practices that were in place at the time any particular guarantee was enacted into the Constitution do not necessarily fix forever the meaning of that guarantee.[35] To be truly faithful to the Framers, "our use of the history of their time must limit itself to broad purposes, not specific practices." *Abington School Dist.* v. *Schempp*, 374 U. S., at 241 (BRENNAN, J., concurring). Our primary task must be to translate "the majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials dealing with the

---

[34] See generally 1 Annals of Cong. 431–433, 662, 730 (1789); *Barron* v. *Mayor and City Council of Baltimore*, 7 Pet. 243, 250 (1833); E. Dumbauld, The Bill of Rights and What it Means Today 10–34 (1957); 2 Schwartz, *supra*, at 697–980, 983–984.

[35] See, *e. g.*, *Frontiero* v. *Richardson*, 411 U. S. 677 (1973) (gender discrimination); *Brown* v. *Board of Education*, 347 U. S. 483 (1954) (race discrimination); *Colgrove* v. *Battin*, 413 U. S. 149, 155–158 (1973) (jury trial); *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (cruel and unusual punishment); *Katz* v. *United States*, 389 U. S. 347 (1967) (search and seizure).

problems of the twentieth century . . . ." *West Virginia Bd. of Education* v. *Barnette*, 319 U. S. 624, 639 (1943).

The inherent adaptability of the Constitution and its amendments is particularly important with respect to the Establishment Clause. "[O]ur religious composition makes us a vastly more diverse people than were our forefathers. . . . In the face of such profound changes, practices which may have been objectionable to no one in the time of Jefferson and Madison may today be highly offensive to many persons, the deeply devout and the nonbelievers alike." *Schempp, supra,* at 240–241 (BRENNAN, J., concurring). Cf. *McDaniel* v. *Paty*, 435 U. S. 618, 628 (1978) (plurality opinion). President John Adams issued during his Presidency a number of official proclamations calling on all Americans to engage in Christian prayer.[36] Justice Story, in his treatise on the Constitution, contended that the "real object" of the First Amendment "was, not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects . . . ."[37] Whatever deference Adams' actions and Story's views might once have deserved in this Court, the Establishment Clause must now be read in a very different light. Similarly, the Members of the First Congress should be treated, not as sacred figures whose every action must be emulated, but as the authors of a document meant to last for the ages. Indeed, a proper respect for the Framers themselves forbids us to give so static and lifeless a meaning to their work. To my mind, the Court's focus here on a narrow piece of history is, in a fundamental sense, a betrayal of the lessons of history.

---

[36] See Pfeffer 266; 1 Stokes 513.

[37] 3 Story, *supra,* § 1871. Cf. *Church of Holy Trinity* v. *United States*, 143 U. S. 457, 470–471 (1892); *Vidal* v. *Girard's Executors*, 2 How. 127, 197–199 (1844).

## B

Of course, the Court does not rely entirely on the practice of the First Congress in order to validate legislative prayer. There is another theme which, although implicit, also pervades the Court's opinion. It is exemplified by the Court's comparison of legislative prayer with the formulaic recitation of "God save the United States and this Honorable Court." *Ante,* at 786. It is also exemplified by the Court's apparent conclusion that legislative prayer is, at worst, a "'mere shadow'" on the Establishment Clause rather than a "'real threat'" to it. *Ante,* at 795, quoting *Schempp, supra,* at 308 (Goldberg, J., concurring). Simply put, the Court seems to regard legislative prayer as at most a *de minimis* violation, somehow unworthy of our attention. I frankly do not know what should be the proper disposition of features of our public life such as "God save the United States and this Honorable Court," "In God We Trust," "One Nation Under God," and the like. I might well adhere to the view expressed in *Schempp* that such mottos are consistent with the Establishment Clause, not because their import is *de minimis*, but because they have lost any true religious significance. 374 U. S, at 303–304 (BRENNAN, J., concurring). Legislative invocations, however, are very different.

First of all, as JUSTICE STEVENS' dissent so effectively highlights, legislative prayer, unlike mottos with fixed wordings, can easily turn narrowly and obviously sectarian.[38] I agree with the Court that the federal judiciary should not sit as a board of censors on individual prayers, but to my mind the better way of avoiding that task is by striking down all official legislative invocations.

---

[38] Indeed, the prayers said by Reverend Palmer in the Nebraska Legislature *are* relatively "nonsectarian" in comparison with some other examples. See, *e. g.,* Massachusetts Senate Prayers 11, 14–17, 71–73, 108; Invocations by Rev. Fred S. Holloman, Chaplain of the Kansas Senate, 1980–1982 Legislative Sessions, pp. 40–41, 46–47, 101–102, 106–107.

More fundamentally, however, *any* practice of legislative prayer, even if it might look "nonsectarian" to nine Justices of the Supreme Court, will inevitably and continuously involve the State in one or another religious debate.[39] Prayer is serious business—serious theological business—and it is not a mere "acknowledgment of beliefs widely held among the people of this country" for the State to immerse itself in that business.[40] Some religious individuals or groups find it theologically problematic to engage in joint religious exercises predominantly influenced by faiths not their own.[41] Some might object even to the attempt to fashion a "nonsectarian" prayer.[42] Some would find it impossible to participate in any "prayer opportunity," *ante*, at 794, marked by

---

[39] See generally Cahn, On Government and Prayer, 37 N. Y. U. L. Rev. 981 (1962); Hearings, at 47 (testimony of M. Howard) ("there is simply no such thing as 'nonsectarian' prayer . . .").

Cf. N. Y. Times, Sept. 4, 1982, p. 8, col. 2 ("Mr. [Jerry] Falwell [founder of the organization "Moral Majority"] is quoted as telling a meeting of the Religious Newswriters Association in New Orleans that because members of the Moral Majority represented a variety of denominations, 'if we ever opened a Moral Majority meeting with prayer, silent or otherwise, we would disintegrate' ").

[40] I put to one side, not because of its irrelevance, but because of its obviousness, the fact that any official prayer will pose difficulties both for nonreligious persons and for religious persons whose faith does not include the institution of prayer, see, *e. g.*, H. Smith, The Religions of Man 138 (Perennial Library ed. 1965) (discussing Theravada Buddhism).

[41] See, *e. g.*, Hearings, at 46–47 (testimony of M. Howard) ("We are told that [school] prayers could be 'nonsectarian,' or that they could be offered from various religious traditions in rotation. I believe such a solution is least acceptable to those most fervently devoted to their own religion"); S. Freehof, Modern Reform Responsa 71 (1971) (ecumenical services not objectionable in principle, but they should not take place too frequently); J. Bancroft, Communication in Religious Worship with Non-Catholics (1943).

[42] See, *e. g.*, Hearings, at 47 (testimony of M. Howard) (nonsectarian prayer, even if were possible, would likely be "offensive to devout members of all religions").

Trinitarian references.[43]   Some would find a prayer *not* invoking the name of Christ to represent a flawed view of the relationship between human beings and God.[44]   Some might find any petitionary prayer to be improper.[45]   Some might find any prayer that lacked a petitionary element to be deficient.[46]   Some might be troubled by what they consider shallow public prayer,[47] or nonspontaneous prayer,[48] or prayer without adequate spiritual preparation or concentration.[49]   Some might, of course, have *theological* objections to any prayer sponsored by an organ of government.[50]   Some

---

[43] See, *e. g.*, S. Freehof, Reform Responsa 115 (1960).

[44] See, *e. g.*, D. Bloesch, The Struggle of Prayer 36–37 (1980) (hereinafter Bloesch) ("Because our Savior plays such a crucial role in the life of prayer, we should always pray having in mind his salvation and intercession.   We should pray not only in the spirit of Christ but also in the name of Christ. . . . To pray in his name means that we recognize that our prayers cannot penetrate the tribunal of God unless they are presented to the Father by the Son, our one Savior and Redeemer"); cf. Fischer, The Role of Christ in Christian Prayer, 41 Encounter 153, 155–156 (1980).

As the Court points out, Reverend Palmer eliminated the Christological references in his prayers after receiving complaints from some of the State Senators. *Ante*, at 793, n. 14.   Suppose, however, that Reverend Palmer had said that he could not in good conscience omit some references. Should he have been dismissed?   And, if so, what would have been the implications of *that* action under both the Establishment and the Free Exercise Clauses?

[45] See, *e. g.*, Meister Eckhart 88–89 (R. Blakney trans. 1941); T. Merton, Contemplative Prayer (1971); J. Williams, What Americans Believe and How they Worship 412–413 (3d ed. 1969) (hereinafter Williams) (discussing Christian Science belief that only proper prayer is prayer of communion).

[46] See, *e. g.*, Bloesch 72–73; Stump, Petitionary Prayer, 16 Am. Philosophical Q. 81 (1979); Wells, Prayer: Rebelling Against the Status Quo, Christianity Today, Nov. 2, 1979, pp. 32–34.

[47] See, *e. g.*, Matthew 6:6 ("But thou, when thou prayest, enter into thy closet, and when thou hast shut thy door, pray to thy Father which is in secret; and thy Father which seeth in secret shall reward thee openly").

[48] See, *e. g.*, Williams 274–275 (discussing traditional Quaker practice).

[49] See, *e. g.*, Heschel, *supra* n. 28, at 53; Heiler, *supra* n. 24, at 283–285.

[50] See, *e. g.*, Williams 256; 3 Stokes 133–134; Hearings, at 65–66 (statement of Baptist Joint Committee on Public Affairs).

might object on theological grounds to the level of political neutrality generally expected of government-sponsored invocational prayer.[51] And some might object on theological grounds to the Court's requirement, *ante*, at 794, that prayer, even though religious, not be proselytizing.[52] If these problems arose in the context of a religious objection to some otherwise decidedly secular activity, then whatever remedy there is would have to be found in the Free Exercise Clause. See n. 13, *supra*. But, in this case, we are faced with potential religious objections to an activity at the very center of religious life, and it is simply beyond the competence of government, and inconsistent with our conceptions of liberty, for the State to take upon itself the role of ecclesiastical arbiter.

## IV

The argument is made occasionally that a strict separation of religion and state robs the Nation of its spiritual identity. I believe quite the contrary. It may be true that individuals cannot be "neutral" on the question of religion.[53] But the judgment of the Establishment Clause is that neutrality by the organs of *government* on questions of religion is both possible and imperative. Alexis de Tocqueville wrote the following concerning his travels through this land in the early 1830's:

> "The religious atmosphere of the country was the first thing that struck me on arrival in the United States. . . .
>
> "In France I had seen the spirits of religion and of freedom almost always marching in opposite directions. In America I found them intimately linked together in joint reign over the same land.

---

[51] See, *e. g.*, R. Niebuhr, Faith and Politics 100 (R. Stone ed. 1968) ("A genuinely prophetic religion speaks a word of judgment against every ruler and every nation, even against good rulers and good nations").

[52] See, *e. g.*, Bloesch 159 ("World evangelization is to be numbered among the primary goals in prayer, since the proclaiming of the gospel is what gives glory to God").

[53] See W. James, The Will to Believe 1–31 (1st ed. 1897).

"My longing to understand the reason for this phenomenon increased daily.

"To find this out, I questioned the faithful of all communions; I particularly sought the society of clergymen, who are the depositaries of the various creeds and have a personal interest in their survival. . . . I expressed my astonishment and revealed my doubts to each of them; I found that they all agreed with each other except about details; all thought that the main reason for the quiet sway of religion over their country was the complete separation of church and state. I have no hesitation in stating that throughout my stay in America I met nobody, lay or cleric, who did not agree about that." Democracy in America 295 (G. Lawrence trans., J. Mayer ed., 1969).

More recent history has only confirmed De Tocqueville's observations.[54] If the Court had struck down legislative prayer today, it would likely have stimulated a furious reaction. But it would also, I am convinced, have invigorated both the "spirit of religion" and the "spirit of freedom."

I respectfully dissent.

JUSTICE STEVENS, dissenting.

In a democratically elected legislature, the religious beliefs of the chaplain tend to reflect the faith of the majority of the

---

[54] See generally J. Murray, We Hold These Truths 73–74 (1960) (American religion "has benefited . . . by the maintenance, even in exaggerated form, of the distinction between church and state"); Martin, Revived Dogma and New Cult, 111 Daedalus 53, 54–55 (1982) (The "icy thinness of religion in the cold airs of Northwest Europe and in the vapors of Protestant England is highly significant, because it represents a fundamental difference in the Protestant world between North America and the original exporting countries. In all those countries with stable monarchies and Protestant state churches, [religious] institutional vitality is low. In North America, lacking either monarchy or state church, it is high" (footnote omitted)).

lawmakers' constituents. Prayers may be said by a Catholic priest in the Massachusetts Legislature and by a Presbyterian minister in the Nebraska Legislature, but I would not expect to find a Jehovah's Witness or a disciple of Mary Baker Eddy or the Reverend Moon serving as the official chaplain in any state legislature. Regardless of the motivation of the majority that exercises the power to appoint the chaplain,[1] it seems plain to me that the designation of a member of one religious faith to serve as the sole official chaplain of a state legislature for a period of 16 years constitutes the preference of one faith over another in violation of the Establishment Clause of the First Amendment.

The Court declines to "embark on a sensitive evaluation or to parse the content of a particular prayer." *Ante*, at 795. Perhaps it does so because it would be unable to explain away the clearly sectarian content of some of the prayers given by Nebraska's chaplain.[2] Or perhaps the Court is unwilling to

---

[1] The Court holds that a chaplain's 16-year tenure is constitutional as long as there is no proof that his reappointment "stemmed from an impermissible motive." *Ante*, at 793. Thus, once again, the Court makes the subjective motivation of legislators the decisive criterion for judging the constitutionality of a state legislative practice. Cf. *Rogers* v. *Lodge*, 458 U. S. 613 (1982), and *City of Mobile* v. *Bolden*, 446 U. S. 55 (1980). Although that sort of standard maximizes the power of federal judges to review state action, it is not conducive to the evenhanded administration of the law. See 458 U. S., at 642–650 (STEVENS, J., dissenting); 446 U. S., at 91–94 (STEVENS, J., concurring in judgment).

[2] On March 20, 1978, for example, Chaplain Palmer gave the following invocation:

"Father in heaven, the suffering and death of your son brought life to the whole world moving our hearts to praise your glory. The power of the cross reveals your concern for the world and the wonder of Christ crucified.

" 'The days of his life-giving death and glorious resurrection are approaching. This is the hour when he triumphed over Satan's pride; the time when we celebrate the great event of our redemption.

824

acknowledge that the tenure of the chaplain must inevitably be conditioned on the acceptability of that content to the silent majority.

I would affirm the judgment of the Court of Appeals.

---

"We are reminded of the price he paid when we pray with the Psalmist:

"'My God, my God, why have you forsaken me, far from my prayer, from the words of my cry?

"'O my God, I cry out by day, and you answer not; by night, and there is no relief for me.

"'Yet you are enthroned in the Holy Place, O glory of Israel!

"'In you our fathers trusted; they trusted, and you delivered them.

"'To you they cried, and they escaped; in you they trusted, and they were not put to shame.

"'But I am a worm, not a man; the scorn of men, despised by the people.

"'All who see me scoff at me; they mock me with parted lips, they wag their heads:

"'He relied on the Lord; let Him deliver him, let Him rescue him, if He loves him.' Amen." App. 103–104.