Justice Breyer,
concurring in the judgment.
In School Dist. of Abington Township v. Schempp, 374 U. S. 203 (1963), Justice Goldberg, joined by Justice Harlan, wrote, in respect to the First Amendment’s Religion Clauses, that there is “no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible.” Id., at 306 (concurring opinion). One must refer instead to the basic purposes of those Clauses. They seek to “assure the fullest possible scope of religious liberty and tolerance for all.” Id., at 305. They seek to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike. Zelman v. Simmons-Harris, 536 U. S. 639, 717-729 (2002) (Breyer, J., dissenting). They seek to maintain that “separation of church and state” that has long been critical to the “peaceful dominion that religion exercises in [this] country,” where the “spirit of religion” and the “spirit of freedom” are productively “united,” “reign[ing] together” but in separate spheres “on the same soil.” A. de Tocqueville, Democracy in America 282-283 (1835) (H. Mansfield & D. Winthrop transís, and eds. 2000). They seek to further the basic principles set forth today by Justice O’Connor in her concurring opinion in McCreary County v. American Civil Liberties Union of Ky., post, at 881.
The Court has made clear, as Justices Goldberg and Harlan noted, that the realization of these goals means that government must “neither engage in nor compel religious practices,” that it must “effect no favoritism among sects or between religion and nonreligion,” and that it must “work deterrence of no religious belief.” Schempp, supra, at 305 (concurring opinion); see also Lee v. Weisman, 505 U. S. 577, *699 587 (1992); Everson v. Board of Ed. of Ewing, 330 U. S. 1, 15-16 (1947). The government must avoid excessive interference with, or promotion of, religion. See generally County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 593-594 (1989); Zelman, supra, at 723-725 (Breyer, J., dissenting). But the Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious. See, e. g., Marsh v. Chambers, 463 U. S. 783 (1983). Such absolutism is not only inconsistent with our national traditions, see, e. g., Lemon v. Kurtzman, 403 U. S. 602, 614 (1971); Lynch v. Donnelly, 465 U. S. 668, 672-678 (1984), but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid.
Thus, as Justices Goldberg and Harlan pointed out, the Court has found no single mechanical formula that can accurately draw the constitutional line in every case. See Schempp, 374 U. S., at 306 (concurring opinion). Where the Establishment Clause is at issue, tests designed to measure “neutrality” alone are insufficient, both because it is sometimes difficult to determine when a legal rule is “neutral,” and because
“untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious.” Ibid.
Neither can this Court’s other tests readily explain the Establishment Clause’s tolerance, for example, of the prayers that open legislative meetings, see Marsh, supra; certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving. See, *700 e. g., Lemon, supra, at 612-613 (setting forth what has come to be known as the “Lemon test”); Lynch, supra, at 687 (O’Connor, J., concurring) (setting forth the “endorsement test”); Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 800, n. 5 (1995) (Stevens, J., dissenting) (agreeing that an “endorsement test” should apply but criticizing its “reasonable observer” standard); Santa Fe Independent School Dist. v. Doe, 530 U. S. 290, 319 (2000) (Rehn-QUIST, C. J., dissenting) (noting Lemon’s “checkered career in the decisional law of this Court”); County of Allegheny, supra, at 655-656 (Kennedy, J., joined by Rehnquist, C. J., and White and Scalia, JJ., concurring in judgment in part and dissenting in part) (criticizing the Lemon test).
If the relation between government and religion is one of separation, but not of mutual hostility and suspicion, one will inevitably find difficult borderline cases. And in such cases, I see no test-related substitute for the exercise of legal judgment. See Schempp, supra, at 305 (Goldberg, J., concurring); cf. Zelman, supra, at 726-728 (Breyer, J., dissenting) (need for similar exercise of judgment where quantitative considerations matter). That judgment is not a personal judgment. Rather, as in all constitutional cases, it must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes. While the Court’s prior tests provide useful guideposts — and might well lead to the same result the Court reaches today, see, e. g., Lemon, supra, at 612-613; Capitol Square, supra, at 773-783 (O’Connor, J., concurring in part and concurring in judgment) — no exact formula can dictate a resolution to such fact-intensive cases.
The case before us is a borderline case. It concerns a large granite monument bearing the text of the Ten Commandments located on the grounds of the Texas State Capitol. On the one hand, the Commandments’ text undeniably has a religious message, invoking, indeed emphasizing, the *701 Deity. On the other hand, focusing on the text of the Commandments alone cannot conclusively resolve this case. Rather, to determine the message that the text here conveys, we must examine how the text is used. And that inquiry requires us to consider the context of the display.
In certain contexts, a display of the tablets of the Ten Commandments can convey not simply a religious message but also a secular moral message (about proper standards of social conduct). And in certain contexts, a display of the tablets can also convey a historical message (about a historic relation between those standards and the law) — a fact that helps to explain the display of those tablets in dozens of courthouses throughout the Nation, including the Supreme Court of the United States. See generally App. to Brief for United States as Amicus Curiae la-7a.
Here the tablets have been used as part of a display that communicates not simply a religious message, but a secular message as well. The circumstances surrounding the display’s placement on the capítol grounds and its physical setting suggest that the State itself intended the latter, nonreligious aspects of the tablets’ message to predominate. And the monument’s 40-year history on the Texas state grounds indicates that that has been its effect.
The group that donated the monument, the Fraternal Order of Eagles, a private civic (and primarily secular) organization, while interested in the religious aspect of the Ten Commandments, sought to highlight the Commandments’ role in shaping civic morality as part of that organization’s efforts to combat juvenile delinquency.' See Tex. S. Con. Res. 16, 57th Leg., Reg. Sess. (1961). The Eagles’ consultation with a committee composed of members of several faiths in order to find a nonsectarian text underscores the group’s ethics-based motives. See Brief for Respondents 5-6, and n. 9. The tablets, as displayed on the monument, prominently acknowledge that the Eagles donated the display, a factor which, though not sufficient, thereby further distances *702 the State itself from the religious aspect of the Commandments’ message.
The physical setting of the monument, moreover, suggests little or nothing of the sacred. See Appendix A, infra. The monument sits in a large park containing 17 monuments and 21 historical markers, all designed to illustrate the “ideals” of those who settled in Texas and of those who have lived there since that time. Tex. H. Con. Res. 38, 77th Leg., Reg. Sess. (2001); see Appendix B, infra. The setting does not readily lend itself to meditation or any other religious activity. But it does provide a context of history and moral ideals. It (together with the display’s inscription about its origin) communicates to visitors that the State sought to reflect moral principles, illustrating a relation between ethics and law that the State’s citizens, historically speaking, háve endorsed. That is to say, the context suggests that the State intended the display’s moral message — an illustrative message reflecting the historical “ideals” of Texans — to predominate.
If these factors provide a strong, but not conclusive, indication that the Commandments’ text on this monument conveys a predominantly secular message, a further factor is determinative here. As far as I can tell, 40 years passed in which the presence of this monument, legally speaking, went unchallenged (until the single legal objection raised by petitioner). And I am not aware of any evidence suggesting that this was due to a climate of intimidation. Hence, those 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to “engage in” any “religious practice],” to “compel” any “religious practic[e],” or to “work deterrence” of any “religious belief.” Schempp, 374 U. S., at 305 (Goldberg, J., concurring). Those 40 years suggest that *703 the public visiting the capítol grounds has considered the religious aspect of the tablets’ message as part of what is a broader moral and historical message reflective of a cultural heritage.
This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating ehurch and state. See, e. g., Weisman, 505 U. S., at 592; Stone v. Graham, 449 U. S. 39 (1980) (per curiam). This case also differs from McCreary County, where the short (and stormy) history of the courthouse Commandments’ displays demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them. See post, at 869-873 (opinion of the Court). That history there indicates a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document. And, in today’s world, in a Nation of so many different religious and comparable nonreligious fundamental beliefs, a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, preexisting monument has not.
For these reasons, I believe that the Texas display — serving a mixed but primarily nonreligious purpose, not primarily “advanc[ing]” or “inhibiting] religion,” and not creating an “excessive government entanglement with religion”— might satisfy this Court’s more formal Establishment Clause tests. Lemon, 403 U. S., at 612-613 (internal quotation marks omitted); see also Capitol Square, 515 U. S., at 773-783 (O’Connor, J., concurring in part and concurring in judgment). But, as I have said, in reaching the conclusion that the Texas display falls on the permissible side of the constitutional line, I rely less upon a literal application of any partic *704 ular test than upon consideration of the basic purposes of the First Amendment’s Religion Clauses themselves. This display has stood apparently uncontested for nearly two generations. That experience helps us understand that as a practical matter of degree this display is unlikely to prove divisive. And this matter of degree is, I believe, critical in a borderline case such as this one.
At the same time, to reach a contrary conclusion here, based primarily on the religious nature of the tablets’ text would, I fear, lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause traditions. Such a holding might well encourage disputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation. And it could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid. Zelman, 536 U. S., at 717-729 (Breyer, J., dissenting).
Justices Goldberg and Harlan concluded in Schempp that
“[t]he First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact.” 374 U. S., at 308 (concurring opinion).
That kind of practice is what we have here. I recognize the danger of the slippery slope. Still, where the Establishment Clause is at issue, we must “distinguish between real threat and mere shadow.” Ibid. Here, we have only the shadow.
In light of these considerations, I cannot agree with today’s plurality’s analysis. Nor can I agree with Justice Scalia’s dissent in McCreary County, post, at 885. I do agree with Justice O’Connor’s statement of principles in McCreary County, post, at 881-883, though I disagree with *705 her evaluation of the evidence as it bears on the application of those principles to this case.
I concur in the judgment of the Court.
[Appendixes A and B to opinion of Breyer, J., follow this page.]
*707 [[Image here]]
*709 [[Image here]]