Gerald **GAGLIARDI, et al., Plaintiffs,**

v.

**CITY OF BOCA RATON, Defendant,**

**and**

**Chabad of East Boca, Inc., et al., Intervenors.**

**CASE NO.:16-CV-80195-KAM**

United States District Court, S.D. Florida.

Signed 07/21/2016

Marci A. Hamilton, Washington Crossing, PA, Arthur C. Koski, Arthur C. Koski PA, Boca Raton, FL, for Plaintiff.

Daniel Lawrence Abbott, Weiss Serota Helfman Cole Bierman & Popok, P.L., Jamie Alan Cole, Weiss Serota Helfman Pastoriza et al, Fort Lauderdale, FL, Adam Abraham Schwartzbaum, Weiss Serota Helfman Cole & Bierman, P.L., Coral Gables, FL, for Defendant.

Daniel H. Blomberg, Lori H. Windham, Becket Fund for Religious Libert, Washington, DC, Elliot C. Harvey Schatmeier, Jay P. Lefkowitz, Steven J. Menashi, Kirkland & Ellis, LLP, New York, NY, Henry B. Handler, Weiss, Handler & Cornwell, PA, Boca Raton, FL, Lawrence C. Marshall, Kirkland & Ellis, LLP, Chicago, IL, for Intervenors.

## ORDER GRANTING MOTION TO DISMISS

KENNETH A. MARRA, United States District Judge

This matter is before the Court on Defendant City of Boca Raton's Motion to Dismiss (DE 21) and Intervenors' Motion to Dismiss (DE 23). For the following reasons, the motions are granted.

## I. Background [1]

In 2007, a religious entity called the Chabad of East Boca, Inc. (the "Chabad") was engaged in a potential acquisition of residential properties in a residential area in the City of Boca Raton (the "City") known as the Golden Triangle. (DE 1 ¶ 21.) The Chabad intended to assemble the contiguous single-family residences for religious purposes, including conducting religious services and operating a religious school. (DE 1 ¶ 22.) At the time, the Golden Triangle area was zoned for single-family residences and was adjacent to a community redevelopment project of the City known as Mizner Park. (DE 1 ¶ 23.) Mizner Park consists of a mixture of high-end retail establishments, restaurants, and residential apartments, and is a major source of revenue for the City. (DE 1 ¶ 23.)

When Chabad's intentions became publicly known, Golden Triangle residents formed opposition groups to voice objections to the City permitting the Chabad's religious operations in their neighborhood. (DE 1 ¶ 24.) Such opposition was motivated by religious animus together with a desire to protect the residential quality of the Golden Triangle neighborhood. (DE 1 ¶ 24.)

In late 2007, the City introduced Ordinance No. 5014 to allow "places of worship" as a permitted use in a single-family zoning district such as the Golden Triangle. (DE 1 ¶ 25.) At this time, the majority of places of worship were located in single-family zoning districts, but they were not the subject of any land use restrictions in

1. The following facts are taken from the Plaintiffs' complaint.

those districts. (DE 1 ¶ 25.) Ordinance No. 5014 would have allowed the Chabad to introduce its full program of religious activities into the Golden Triangle neighborhood, subject to additional parking requirements set forth in the ordinance. (DE 1 ¶ 25.)

At public hearings, in the media, and in private conversations with City elected officials, Golden Triangle residents expressed the desire to completely prohibit all Chabad operations in their neighborhood. (DE 1 ¶ 26.) The issue became "extremely contentious." (DE 1 ¶ 26.) The City was also concerned that the proposed location of the Chabad was too close to Mizner Park, which was the venue of numerous public concerts and events and which was an attraction where the general public would stroll the sidewalks and frequent outdoor dining and retail establishments. (DE 1 ¶ 27.)

The conflict between the Golden Triangle community, the Chabad, and the City was the focus of much publicity and led to secret discussions between the City, the Chabad, representatives and attorneys for the Golden Triangle residents, and a local developer. (DE 1 ¶ 28.)

The local developer owned a small, vacant piece of land (the "Property") outside the Golden Triangle and Mizner Park area. (DE 1 ¶¶ 28–28a, 35.) At the time, the Property was zoned "B-1," which permitted construction of a "place of public assembly" but did not permit construction of a "place of worship," such as the Chabad. (DE 1 ¶ 28.)

In January 2008, the City, through its City Council, declined to proceed with consideration of the previously introduced Or-

dinance No. 5014. (DE 1 ¶ 29.) This decision was based upon public opposition to the ordinance and despite legal advice that federal law and existing land development law justified the ordinance. (DE 1 ¶ 29.) On March 25, 2008, the City's manager stated at a public meeting of the City Council that City staff were working on the issue of "places of worship" and that a report by the City's staff would be provided to the City Council in May or June 2008. (DE 1 ¶ 29.)

Around the same time the City deferred action on Ordinance No. 5014, the Chabad and the developer who owned the Property were engaged in discussions about the potential construction of the Chabad on the Property. (DE 1 ¶ 30.) At this time, however, the Chabad, the developer, and the City were aware that the Chabad could not be constructed on the Property due to City zoning laws that prohibited "places of worship." (DE 1 ¶ 30.)

In a "political act" to appease the Golden Triangle residents, to alleviate the City's concerns regarding the Chabad's impact on Mizner Park, to financially benefit the developer, "and to unconstitutionally advance and create a special privilege for the religion of the Chabad," the City initiated a change of its zoning code "without regard to the constitutional rights of Plaintiffs." (DE 1 ¶ 31.) The City's manager directed the Planning and Zoning Staff to perform all work necessary, including staff reports and recommendations, to change via ordinance the permitted use the Property to include "places of worship." (DE 1 ¶ 31.) This "secretly planned" change of permitted use was for the "sole purpose" of allowing construction of the Chabad on the property.[2] (DE 1 ¶ 31.) With the "secret directive" given to devel-

**2.** While Plaintiffs assert this was the "sole   purpose" of the change, at the beginning of

op a process to ensure that the Chabad would be allowed to build on the Property, City staff advanced the issue by composing new definitions for permitted "uses" under the definition of "places of public assembly" in the City's Code of Ordinances. (DE 1 ¶ 32.)

On May 28, 2008, without the "promised" report regarding prior Ordinance No. 5014, without any public comment on Ordinance No. 5014, and without any discussion by the City Council at a public meeting or hearing on the issue of "places of worship," the City introduced Ordinance No. 5040. (DE 1 ¶ 33.) Ordinance No. 5040 limited "places of worship" in a residential district (which had the opposite effect of proposed Ordinance No. 5014) and added "places of worship" to the City Code definition of "places of public assembly." (DE 1 ¶ 33.) In effect, Ordinance No. 5040 would prohibit the Chabad from building in the Golden Triangle area, but allow the Chabad to build on the Property. (DE 1 ¶ 33.) Ordinance No. 5040 was "tailor-made" for the Chabad to benefit. (DE 1 ¶ 33.)

The City held public hearings regarding Ordinance No. 5040 on July 22, 2008, August 26, 2008, September 8, 2008, and September 9, 2008. (DE 1 ¶ 34.) The City adopted Ordinance No. 5040 at the September 9, 2008 hearing. (DE 1 ¶ 34.) At no time were the "secret" meetings and agreed-upon arrangements between the City, the developer, and the Chabad disclosed to the public or the Plaintiffs. (DE 1 ¶ 34.) Nor was the purpose of the City, the developer, and the Chabad to reconfigure City law by placing new restrictions in

residential neighborhoods for houses of worship and expanding "uses" for houses of worship under "places of public assembly" disclosed to the public or Plaintiffs. (DE 1 ¶ 34.) Also, at no time was it disclosed to the public that the adoption of Ordinance No. 5040 was for the "sole purpose" of advancing the Chabad's religion.[3] (DE 1 ¶ 34.)

After the undisclosed agreement between the City and the Chabad for the Chabad to abandon its plans to conduct religious activities in the Golden Triangle and Mizner Park area, the City and the Chabad agreed, in private conversations, for construction of the Chabad building to be located on the Property. (DE 1 ¶ 35.) To "consummate its illegal, secret agreement" with the Chabad and the developer and to issue all necessary approvals to allow the construction of the Chabad's religious project, the City needed to grant numerous "unlawful" variances and "favorable, intentional[,] and erroneous" interpretations of the City's Code. (DE 1 ¶ 36.) Through these acts, the City "continued to grant the Chabad numerous and special privileges." (DE 1 ¶ 36.)

After obtaining the change of permitted use of the Property through Ordinance No. 5040, the Chabad filed applications to construct a two-story, 18,364 square foot "place of public assembly" (which was now defined to include a "place of worship") on the Property. (DE 1 ¶ 38.) The building application requested a variance to increase the height of the building to 40 feet and eight inches, which exceeded the 30 foot maximum allowed for the Property. (DE 1 ¶ 39.) The Chabad also proposed

the *same paragraph* Plaintiffs allege multiple purposes.

3. This new "sole purpose" is in addition to those described in note 2 *supra*. All of these cannot be a "sole" purpose.

inadequate parking based on City-mandated parking requirements. (DE 1 ¶¶ 39a, 40.) The City granted a variance for parking and access to the Chabad. (DE 1 ¶ 40.) The proposed building and improvements of the religious structure encompassed 95% of the area of the Property, which was far in excess of any other non-religious building in a similar B-1 zoning district. (DE 1 ¶ 40.)

On May 7, 2015, based on the mandate from the City's manager and recommendations from the City's staff, the City's Planning and Zoning Board conducted a final public hearing on the Chabad's application. (DE 1 ¶ 42.) Based upon the prior undisclosed agreement between the City, the developer, and the Chabad, the Planning and Zoning Board approved the building. (DE 1 ¶ 42.) This approval was allegedly based on the City's staff's "predetermined and directed recommendations" to give the Chabad "religious preferences." (DE 1 ¶ 42.)

On May 27, 2015, the City Council approved the increased height of the building. (DE 1 ¶ 43.) This finalized the approval of the Chabad's application and was based on the recommendations of the City's staff "as directed" by the City's manager. (DE 1 ¶¶ 43–44.) The City's deviations, variances, and "knowingly erroneous" interpretations of the City's rules, regulations, laws, and ordinances were "all conducted to advance the religious purpose of the Chabad." (DE 1 ¶ 43.)

According to Plaintiffs, to grant the final approval of the Chabad's application and to complete the establishment of the religious project, the City "willfully and knowingly" permitted a prohibited use on the Property, ignored the building's parking deficiencies, allowed deficient parking for the building, approved a building that exceeded the allowable size, approved deviations and variances that "did not meet legal criteria," and ignored that the building was out of character and "injurious to residents in the area including" Plaintiffs. (DE 1 ¶ 44.) The City was aware of the deficiencies of the Chabad's project yet granted deviations from the City's Code, ignored "mandatory" standards of the Code, authorized an impermissible size and height of the building, and intentionally interpreted the Code "in a manner to improperly advance the religious interest of the Chabad." (DE 1 ¶ 45.) Plaintiffs allege that any secular proposal of similar size and impact "would not have" received the "special treatment" the City accorded the Chabad. (DE 1 ¶ 41.) Plaintiffs also claim that no other religious entity has ever received similar City assistance in exceeding established land use laws, ordinances, and regulations in the history of the City. (DE 1 ¶ 41.)

On February 8, 2016, Plaintiffs initiated this action against the City. (DE 1.) Plaintiffs describe themselves as "taxpayers of the City of Boca Raton and the Federal Government," residents of the City of Boca Raton, and members of "a Christian religion." (DE 1 ¶¶ 9–11.) Plaintiffs allege that the City's actions violate the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Florida Constitution. The Chabad and the owner of the Property filed a motion to intervene, which the Court granted. (DE 14.) The City and the Intervenors moved to dismiss on various grounds, including lack of standing.

## II. Legal Standard

Questions regarding standing implicate a court's subject-matter jurisdiction

and "must be addressed prior to and independent of the merits of a party's claims." *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir.2008) (per curiam) (citation omitted). The party invoking the court's subject-matter jurisdiction bears the burden of proving the essential elements of standing. *Id.* "For purposes of ruling on a motion to dismiss for want of standing," the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

### III. Discussion

■ The "irreducible constitutional minimum" of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, ⸻ U.S. ⸻, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element." *Id.* (quoting *Warth*, 422 U.S. at 518, 95 S.Ct. 2197) (alteration in original).

■ To establish the first element, injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct.

2130). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130). To be "concrete," an injury must be *"de facto,"* meaning "it must actually exist." *Id.*

■ Plaintiffs' arguments that they have established an injury in fact lack merit. Plaintiffs contend that they "have shown that the favorable treatment provided by the City to the Chabad directly harms Plaintiffs because it benefits one entity to the exclusion of all other entities." (DE 31 at 5.) But Plaintiffs fail to identify what benefit they have been excluded from. Indeed, they do not allege that they have sought and been denied any benefit. They only speculatively assert that any secular building proposal "would not have" received the same special treatment the City allegedly accorded the Chabad. (DE 1 ¶ 41.) Such speculation does not establish an injury in fact.

Plaintiffs also argue that they have established an injury in fact because "the Court's intervention would return the Golden Triangle's zoning ordinance to its prior state." (DE 31 at 5.) But, again, Plaintiffs fail to demonstrate how the change in the zoning laws harmed them.[4] And Plaintiffs' argument that they have suffered an injury in fact because they "should have been permitted to participate in hearings regarding the actual plan crafted solely for the Chabad" fails because they do not allege they were denied participation in any hearing.

Plaintiffs fail to allege any injury at all, let alone one that is concrete and particularized. The closest they come to asserting

4. Though this relates to the redressability prong of standing, Plaintiffs also fail to demonstrate how they would personally benefit

from the zoning laws being returned to their prior state.

an injury is when they allege that the building is "injurious to residents in the area including" Plaintiffs. (DE 1 ¶ 44.) This allegation is insufficient because it merely states in conclusory fashion that the building is "injurious" without specifying *how* it causes injury. Furthermore, it appears that the building has not been built yet. (DE 1 at 36) (requesting injunctive relief against the City "enjoining development of the [Property]"). It is unclear how a nonexistent building can be "injurious." In any event, Plaintiffs also fail to allege how the eventual construction of the building will create an injury in fact.

Instead, Plaintiffs assert only a generalized grievance of alleged government nonobservance of the Constitution—the type of claim the Supreme Court has repeatedly held insufficient to support standing. *Lujan*, 504 U.S. at 573–74, 112 S.Ct. 2130 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.").

Plaintiffs also argue that they have "taxpayer standing." As Plaintiffs' claims are against a municipality, Plaintiffs' status as federal taxpayers and citation to *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), is irrelevant. On the other hand, Plaintiffs' status as municipal taxpayers is relevant. A municipal taxpayer has standing "when the taxpayer is a resident who can establish that tax expenditures were used for the offensive practice." *Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1280 (11th Cir.2008); *see also Frothingham v. Mellon*, 262 U.S. 447, 486, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (decided with *Massachusetts v. Mellon*) ("[R]esident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation. The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate.... But the relation of a taxpayer of the United States to the federal government is very different." (internal citation omitted)).

Nevertheless, Plaintiffs lack standing because they fail to identify an allegedly illegal use of taxpayer money. The only expenditure they identify is the payment of salaries to City employees who allegedly "provided favorable treatment to one religious group." (DE 30 at 16.) This is insufficient to establish that public funds were used for an allegedly offensive practice. "Nearly all governmental activities are conducted or overseen by employees whose salaries are funded by tax dollars. To confer taxpayer standing on such a basis would allow any municipal taxpayer to challenge virtually any governmental action at any time. Article III, as interpreted by the Supreme Court, requires a good deal more." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 74 (2d Cir.2001). Instead, to rely on municipal taxpayer

standing, Plaintiffs must demonstrate "a measurable appropriation or loss of revenue attributable to the challenged activities."[5] *Id.* Their failure to do so forecloses any argument based on taxpayer standing.

Plaintiffs request leave to amend in the event their complaint is dismissed. As it is unclear whether additional facts may support standing, the Court will grant Plaintiffs one additional opportunity to plead a proper basis for standing. The Court notes that, in addition to challenging Plaintiffs' standing, the City and Intervenors raised merits-based challenges to the complaint, which the Court does not reach due to Plaintiffs' failure to establish standing. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir.2005) ("In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims.").

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant City of Boca Raton's Motion to Dismiss (DE 21) and Intervenors' Motion to Dismiss (DE 23) are **GRANTED**. This case is **DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION**. Plaintiffs may file an amended complaint within **10 days** of this order.

**DONE AND ORDERED** in chambers at West Palm Beach, Palm Beach County, Florida, this 21st day of July, 2016.

5. Thus, contrary to Plaintiffs' argument, this case is nothing like *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In *Marsh*, the Court addressed a challenge to a state legislature's practice of opening each legislative day with a prayer by a chaplain paid by the state. *Id.* at 784, 103 S.Ct. 3330. Without analysis, the Court stated in a footnote that the plaintiff, "as a member of the Legislature and as a taxpayer whose taxes are used to fund the chaplaincy, has standing to assert this claim." *Id.* at 786, n. 4, 103 S.Ct. 3330. Though *Marsh* contains no standing analysis, it is distinguishable on the ground that paying the chaplain to conduct a prayer was a measurable appropriation attributable to the challenged activity.